**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PHEENIX USH LLC**<br>**D/B/A SPIN**<br>382 NE 191st St PMB 20388<br>Miami, FL, 33179,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>**DISTRICT DEPARTMENT OF**<br>**TRANSPORTATION**; and **SHARON**<br>**KERSHBAUM, KAREN CALMEISE,**<br>**TED RANDELL, WILLIAM FEENEY,**<br>and **AARON GOLDBECK**, in their official<br>capacities.<br>250 Main Street SE<br>Washington, DC 20003,<br><br>　　　　　　　　Defendants. | Case No. 1:25-cv-00922<br><br>Judge _____<br><br>**VERIFIED COMPLAINT**<br><br><br>**JURY DEMAND ENDORSED**<br>**HEREON** |

## INTRODUCTION

Just two days ago, the District Department of Transportation ("DDOT") took the extraordinary step of kicking out one of the District's long-term providers of mobility solutions valued by the public, Plaintiff Pheenix USH LLC d/b/a Spin ("Spin"). DDOT has commanded Spin to remove its mobility devices, upon which Spin and the public will immediately suffer. Spin will lose customers, face harm to its reputation, and have to lay off employees, while the public will lose access to mobility options and be left subject to the whims of a monopolist with 86% of the market. By contrast, the status quo—allowing Spin to continue to operate as it has been for the past six years, while the merits of this case are resolved—would harm no one.

Specifically, DDOT denied Spin's application for a renewed permit to continue to operate shared micromobility services within the District. This decision was unlawful in several respects, as it resulted from the use of a secret scoring criteria, blatant bias toward other applicants, failure

1

to consider key issues, and general administrative sloppiness. By refusing to follow its own explicit rules and statutory authority, DDOT acted arbitrarily and capriciously in its administration of the permit application process, while also violating constitutional protections of due process and equal protection. Spin is entitled to immediate relief.

For its Verified Complaint for Temporary Restraining Order and Preliminary and Permanent Injunction against Defendants, Spin alleges and states:

<u>**THE PARTIES**</u>

1.      Spin is a Delaware limited liability company with its principal place of business located at 161 Bay Street, Suite 2300 Toronto, Ontario M5J 2S1, Canada. Its mailing address is 382 NE 191st Street, #20388, Miami, Florida 33179.

2.      Spin provides micromobility services for shared e-bikes and e-scooters in cities and universities throughout the United States, including the District of Columbia.

3.      Spin has one member, Blue Jay Transit Inc., which is a Delaware corporation with its principal place of business located at 161 Bay Street, Suite 2300 Toronto, Ontario M5J 2S1, Canada. Its mailing address is 382 NE 191st Street, #20388, Miami, Florida 33179.

4.      DDOT is an agency of the government of the District of Columbia. DDOT manages and maintains publicly owned transportation infrastructure in the District.

5.      Defendants Ted Randell, William Feeney, and Aaron Goldbeck are DDOT employees who served as reviewers during the 2025-2026 permit application process.

6.      Defendant Karen Calmeise is DDOT's Hearing Officer responsible for considering and deciding permit disputes and appeals.

7.      Defendant Sharon Kershbaum is DDOT's Director with final authority to adopt or reject a Hearing Officer's appeal determinations.

8.      All Defendants shall be collectively referred to as "DDOT."

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 because the claim is part of the same case or controversy as the federal questions before the Court.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in the District.

## GENERAL ALLEGATIONS

11.     Spin is a shared fleet device company that has operated in the District of Columbia for over six years.

12.     Throughout that time, Spin has been a leader in key metrics of importance to DDOT, including pioneering new safety technologies, improving the District's workforce by hiring residents as W-2 employees, and providing quality transportation options for District residents.

13.     For example, in the past two years, Spin has expanded its services to low-income patrons through its Low Income Customer Plan, which provides District residents with free transportation to commute to work, access necessary goods and services, and for leisure.

14.     Spin has undoubtedly become a fixture in the District community, and District residents—regardless of income level—rely on Spin's services on a daily basis.

15.     Spin's commitment to bettering transportation services in the District has been reflected in previous permit application processes. Since 2019, Spin has applied for—and been awarded—permits so it can operate its electric mobility device and bicycle services in the District.

16.     Most recently, DDOT awarded Spin A and B Permits to operate from 2023-2024. During the 2023-2024 application process, Spin received the highest score of any applicant.

17.     Despite this stellar track record, DDOT denied Spin's 2025-2026 applications to operate electronic mobility vehicles and shared fleet bicycles in the District.

18.     DDOT's denial resulted from the use of secret scoring criteria, blatant bias toward other applicants, failure to consider key issues, and general administrative sloppiness.

19.     Accordingly, Spin submitted appeals detailing these procedural and substantive shortcomings.

20.     On March 17, 2025, DDOT Hearing Officer Calmeise rejected Spin's appeals, and on March 26, DDOT Director Sharon Kershbaum adopted Calmeise's decisions.

21.     DDOT's decisions will result in Spin's swift exclusion from the District's micromobility market: DDOT (i) has given Spin until April 6, 2025 to remove the entirety of its fleet from the District, (ii) demands Spin now start to "demonstrat[e] efforts to remove devices," and (iii) expects "consistent downward deployment trends."

22.     However, DDOT's denial was arbitrary and capricious, not in accordance with the law, and amounts to an abuse of discretion. Because of this, these decisions cannot stand, and Spin is entitled to injunctive relief.

## I.     2025-2026 Permit Application Requirements and Instructions.

23.     DDOT, through a permit application process, awards Shared Fleet Device Permits so that operators can offer shared fleet devices for rental in the public right-of-way in the District.

24.     DDOT offers two types of permits: Permit A is for shared fleet devices limited to Electric Mobility Devices, and Permit B is for shared fleet devices limited to Shared Fleet Bicycles. Each permit applicant may be awarded one of each permit type per cycle.

25.     In October 2024, DDOT began accepting permit applications for the 2025-2026 Shared Fleet Device Permits.

26.     As part of this process, DDOT published a document titled "Administrative Issuance: Shared Fleet Device Permit Application," (the "Permit Application Instructions") which provided instructions for application submissions, including pertinent dates, requirements, and scoring guidelines.

27.     A true and accurate copy of the Permit Application Instructions is attached and incorporated by reference as **Exhibit A**.

28.     Additionally, DDOT provided a list of answers to commonly asked questions by other applicants ("Permit Application Q&A") to clarify the requirements of the application process.

29.     A true and accurate copy of the Permit Application Questions is attached and incorporated by reference as **Exhibit B**.

30.     Among the Permit Application Instructions was the requirement that all applicants complete an in-person device demonstration. Exhibit A at § 1.3.

31.     The Permit Application Instructions explicitly stated that the demonstration *must* be completed on November 4, 2024: "An in-person demonstration of the shared fleet device that is the subject of the permit application is required for all applicants on 11/04/24." Exhibit A at § 1.3. Failure to complete the in-person demonstration on November 4 would result in disqualification of an applicant's score.

32.     The same guidance was posted on DDOT's shared mobility website, which previously stated: "11/4/2024: Mandatory device demo day" with a link to an online scheduling tool that only allowed applicants to request time slots on November 4, with no exception.

33.     In the Permit Application Q&A, the DDOT further emphasized that extensions to the application deadlines would *not* be granted, as extensions would "jeopardize DDOT's timely

completion of application review and scoring, possible appeals, and administrative processing required to issue permits in accordance with the required January 1st permit start." Ex. B at No. 9 (Oct. 23, 2024).

34.    Further, the 2025 Permit Operator Agreement, with an effective date of January 1, 2025, states that the "Permit Holder *shall immediately serve the entire District of Columbia upon the first day of permitted operations* and for the entirety of the permit period. Permit Holder shall immediately serve the entire Required Service Area upon the first day of permitted operations and for the entirety of the permit period. Failure to launch within thirty (30) days of permit start will result in immediate permit revocation."

35.    A true and accurate copy of the 2025 Permit Operator Agreement is attached and incorporated as **Exhibit C**.

36.    Additionally, the Permit Application Instructions provided a published scoring rubric to be used by DDOT reviewers in grading permit applications.

37.    Broadly, the Permit Application Instructions explained that "[a]pplicants are graded on their understanding of and commitment to the program's regulatory requirements and evidence of effective prior performance in the District[.]" Ex. A at § 2.4.

38.    Under the published scoring rubric, each question was worth up to four points and points were to be assigned to each question as follows:

For each question*:

- 0 ratings fail to meet the criteria established in the regulations or offer solutions that may worsen or create additional challenges and/or limitations to fulfilling the respective criteria.
- 1 ratings meet the minimum regulatory standards and offer rudimentary solutions, claim the minimum level of commitment and ability to solving known challenges and concerns.

- 2 ratings meet the minimum regulatory standards and offer basic or typical, but unexceptional solutions, claiming a moderate level of commitment and ability to solving known challenges and concerns.
- 3 ratings significantly exceed the minimum requirements or display more detailed approaches demonstrating (with specific testing, demonstrations, or research and development) a higher level of commitment to solving known challenges and concerns.
- 4 ratings substantially exceed the minimum requirements, display unique or innovative approaches demonstrating (with specific case studies, past performance, or independently verifiable data) the highest level of commitment and ability to solving known challenges and concerns, and have been exhibited effectively in the District or other markets.

Ex. A at § 2.4.

39.    Pursuant to the Permit Application Instructions, a "score of more than 50% of the total point value is required on all criteria to qualify for permit consideration." Ex. A at § 2.4.

## II.    DDOT's Administration of the 2025-2026 Permit Application Process.

### A.    DDOT violates its instructions and guidance and allows Hopp by Bolt a private in-person demonstration *after* DDOT's deadline and to delay launching operations in the District.

40.    Despite the clear requirements explained in the Permit Application Instructions and reiterated in the Permit Application Q&A, DDOT granted Hopp by Bolt ("Bolt"), a company with no previous experience in the District or North America, two extensions of time as well as preferential treatment.

41.    First, an email from Bolt to DDOT illustrates that Bolt was allowed to delay its in-person demonstration, and receive a private demonstration on November 12, 2024, eight days after the mandatory deadline.

42.    A true and accurate copy of the Bolt email to DDOT is attached and incorporated as **Exhibit D**.

43.    These arrangements for Bolt for the November 12demonstration were neither disclosed during the clarification process nor communicated to other applicants.

44.     Second, at the pre-conference hearing on December 16, 2024, DDOT conveyed to Spin that Bolt received an additional grace period to launch operations *after* January 1, 2025.

45.     This is in direct contradiction with the 2025 Permit Operator Agreement with an effective date of January 1st, 2025, which states that the "Permit Holder *shall immediately serve the entire District of Columbia upon the first day of permitted operations* and for the entirety of the permit period." Ex. C.

46.     As of the date of Spin's Amended Appeals, Bolt had not deployed any shared fleet devices in the District.

**B.     DDOT utilized an unpublished, secret scoring rubric for permit applications.**

47.     On November 5, 2024, DDOT reviewer Ted Randell, in an email to the other reviewers, indicated that applications should be scored using an unpublished rubric that differed from the rubric in the Permit Application Instructions.

48.     A true and accurate copy of the email from Ted Randell is attached and incorporated as **Exhibit E**.

49.     The email stated that a score of 2 will "effectively be an 'average' score, where the operator is restating a requirement or simply meeting the *standards of the industry* or offering examples of previous solutions or outcomes that are unexceptional." Ex. E.

50.     Further, the email stated that 3s should be given only when an operator can effectively exhibit a 'higher' level of commitment and has "some proof to back it up . . . ." (emphasis added). Ex. E.

51.     These are different requirements than the published rubric provided in the Permit Application Instructions.

52.    For example, the published rubric awards a 2 score for meeting "minimum regulatory standards," whereas the secret rubric requires the applicant to meet "the standards of the industry." *Compare* Ex. A. at § 2.4 *with* Ex. E.

53.    The term "standards of the industry" is not defined anywhere in the Permit Application Instructions.

54.    And, by replacing "minimum regulatory requirements" with "standards of the industry," DDOT introduced a level of comparison between applicants not contemplated by the published rubric.

55.    Further, the published rubric awards a 3 score if an applicant does *either* of two things: significantly exceeds the minimum requirements *or* displays detailed approaches demonstrating a higher level of commitment. Ex. A at § 2.4.

56.    By contrast, the secret rubric requires *both* a higher level of commitment *and* "some proof to back it up." Ex. E.

57.    Therefore, the secret rubric required more than the published rubric in that an applicant could not just "significantly exceed" requirements to score a 3; rather, an applicant must show both "higher level of commitment" *and* proof.

58.    In applying this secret rubric, the reviewers effectively disregarded the published criteria.

59.    The reviewers' use of the unpublished, secret scoring rubric resulted in at least twenty-six instances of improper scoring across Spin's Permit A and Permit B applications.

60.    For example, across its Applications, Spin received six incorrect "1" scores based on the fact that Spin did not meet the "industry standard."

61.     Based on the published rubric, Spin should have received a 2—and perhaps even a 3—because Spin met the minimum regulatory requirements and offered more than rudimentary solutions to those questions.

62.     These changes alone would have raised Spin's Permit A score from 374 to 377 and Spin's Permit B score from 363 to 370.

**III.     Denial of Spin's Permit Applications and Subsequent Appeals.**

63.     In line with the requirements laid out in the Permit Application Instructions and explained in the Permit Application Q&A, Spin submitted Permit A and Permit B Applications (the "Applications") on October 31, 2024.

64.     On November 15, 2024, Spin received notice from DDOT that it would not be awarded Permit A or Permit B.

65.     According to the notice received on November 15, 2024, Spin received a score of 374 out of 624 for its Permit A Application and a score of 363 out of 624 possible points for its Permit B Application.

66.     These scores ranked Spin as the 3rdhighest scoring applicant out of eight total applicants for both its Permit A and Permit B Applications.

67.     On November 27, 2024, Spin submitted its appeals of the Permit denials, citing improper scoring of its Applications ("First Appeals").

68.     After submitting its First Appeals, Spin uncovered more information regarding the permit application process as described above, including the use of the secret scoring rubric, the preferential treatment of Bolt, and more instances of improper scoring.

69.     As a result, on December 30, 2024, Spin sent Hearing Officer Calmeise a letter requesting an evidentiary hearing regarding the denial of its Applications.

70.     A true and accurate copy of Spin's Letter to K. Calmeise is attached and incorporated as **Exhibit F**.

71.     In the Letter, Spin outlined the instances of improper conduct as described above and explained that an evidentiary hearing was necessary to "obtain testimony from the [reviewers] regarding several issues, such as DDOT's policy regarding exceptions and the panelists' decision to not disclose [Bolt's] preferential treatment to other applicants." Ex. F.

72.     Notwithstanding this request, Calmeise denied Spin's request and stated that an in-person hearing was unnecessary because "the issues for . . . determination are not dependent on credibility or need to view witness testimony" and that "all necessary documents and responses have been submitted."

73.     A true and accurate copy of K. Calmeise's Email to Spin is attached and incorporated as **Exhibit G**.

74.     On January 17, 2025, Spin submitted a second set of appeals (the "Amended Appeals"), spanning 144 pages, detailing DDOT's improper denial of Spin's Applications for both Permit A and Permit B.

75.     On March 11, 2025, Defendant Calmeise, DDOT Hearing Officer, issued her recommended decisions denying Spin's Amended Appeals ("Recommended Decisions").

76.     True and accurate copies of the Recommended Decisions for Permit A and Permit B are attached and incorporated as **Exhibits H and I**.

77.     Calmeise stated in the Recommended Decisions that she would not consider any arguments pertaining to DDOT's preferential treatment of Bolt, as they were not subject to her review authority.

78.    However, the D.C. Municipal Regulations provide that a Hearing Officer has review authority over DDOT where it:

    i.    improperly or mistakenly applied the scored criteria to the appellant's original application,
    ii.    made a mistake in analyzing or calculating an applicant's final score (or a component thereof), or
    iii.    improperly deemed an application as incomplete.

24 DCMR 3317.8.

79.    Additionally, Calmeise did not meaningfully dispute or rebut Spin's assertions regarding the variations between the secret and unpublished rubrics.

80.    Instead, Calmeise stated that the secret rubric did not significantly differ from the published criteria as listed in the Permit Application Instructions and Spin's position regarding improper scoring "does not support the overall intention to provide exemplary services to the district." Exs. H and I.

81.    On March 26, 2025, Defendant Kershbaum, DDOT Director, adopted Calmeise's Recommended Decisions (the "Final Decision").

82.    A true and accurate copy of the Final Decision is attached and incorporated as **Exhibit J**.

83.    The Final Decision provided that Spin must remove all its devices from the public right of way within 72 hours. *See also* 24 DCMR 3318.6. If Spin were to fail to remove its devices within that time, then Defendants could impound Spin's devices and block Spin from obtaining any additional permit for a two-year period. *See id.*, 24 DCMR 3318.7.

84.    On March 27, 2025, DDOT alerted Spin that it would delay enforcing the 72-hour removal requirement until April 6, 2025, "as long as Spin is demonstrating efforts to remove devices" and displaying "downward deployment trends."

85.     A true and accurate copy of DDOT's March 27, 2025 email to Spin is attached and incorporated as **Exhibit K**.

86.     To that end, Spin must begin removing its fleet imminently, and well prior to April 6, 2025.

## COUNT I
## Judicial Review of Agency Action

87.     Spin incorporates by reference the allegations in the preceding paragraphs of this Verified Complaint as if fully rewritten herein.

88.     DDOT provided all permit applicants with (i) the Permit Application Instructions, which outlined instructions for application submissions, including pertinent dates, requirements, and scoring guidelines and (ii) the Permit Application Q&A, which further explained and clarified DDOT's requirements. Exs. A and B.

89.     Among these was the requirement that each applicant complete an in-person demonstration on November 4, 2024.

90.     DDOT ran afoul of this explicit requirement when it afforded Bolt preferential treatment for a privately arranged in-person demonstration without justification. This was not disclosed to the rest of the applicants, who all completed their mandatory demonstrations on November 4, 2024.

91.     Also, DDOT guidance clearly required those awarded Permits to begin operations in the District on January 1, 2025. DDOT was explicit that extensions would not be granted.

92.     DDOT again failed to abide by its own rules, including the Permit Application Instructions, the Permit Application Q&A, and the 2025 Permit Operator Agreement when it granted Bolt an extension to its launch date.

93.     As a result, DDOT harmed compliant applicants and injured the public interest by not disqualifying an applicant who did not meet the permit application requirements.

94.     To this end, DDOT acted arbitrarily and capriciously and failed to abide by its own stated requirements when it granted preferential treatment to Bolt.

95.     Additionally, the Permit Application Instructions provided the published rubric to be used by DDOT reviewers in scoring applications.

96.     However, DDOT instead used a secret, unpublished rubric to score the applications. This improper or mistaken application of the scoring criteria to certain answers in Spin's Application resulted in incorrect overall scores for Spin's Applications.

97.     In fact, DDOT's use of the secret scoring rubric—which conflated "minimum regulatory standards" and the "standard of the industry" while also requiring more than the published rubric to receive a higher score—resulted in at least twenty-six instances of improper scoring across Spin's Permit A and Permit B Applications.

98.     By using the secret scoring rubric that was materially different from the published rubric in the Permit Application Instructions, DDOT acted arbitrarily and capriciously, committed an error of law, and applied the wrong legal standard.

99.     When alerted of these deficiencies, DDOT Hearing Officer Calmeise denied Spin's request for an evidentiary hearing.

100.    This denial deprived Spin of an opportunity to be heard, and is yet another example of DDOT's arbitrary and capricious administration of the permit application process.

101.    Even further, Hearing Officer Calmeise stated that she would not consider critical arguments detailed in Spin's Amended Appeals, including preferential treatment of Bolt, because the issues were purportedly outside of her review authority.

102.    However, preferential treatment of Bolt clearly falls under the Hearing Officer's authority under the District of Columbia Municipal Regulations, which provide that the Hearing Officer can review DDOT's decisions involving a "mistake in analyzing or calculating an applicant's final score."

103.    Calmeise's failure to consider DDOT's preferential treatment of Bolt when it was clearly subject to her statutory review authority was both arbitrary and capricious and an error of law.

104.    Moreover, Calmeise failed to meaningfully dispute or rebut material variations between the secret rubric and the published rubric as detailed in Spin's Amended Appeals.

105.    Instead, Calmeise dispensed with the secret rubric issue in two paragraphs of her Recommended Decisions and found that the published rubric and secret rubric were consistent with one another.

106.    Calmeise's blind deference to DDOT reviewers was arbitrary and capricious and was not the type of reasoned decision making necessary to support an agency action.

107.    The above-referenced issues illustrate a permit application and appeal process poisoned by arbitrary and capricious agency action that is not in accordance with the law and amounts to an abuse of discretion. To that end, the Final Decision denying Spin's Amended Appeals should be set aside.

## COUNT II
## Due Process

108.    Spin incorporates by reference the allegations in the preceding paragraphs of this Verified Complaint as if fully rewritten herein.

109.    The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. AMEND. V.

110.    DDOT's decision to kick Spin out of the District's micromobility market deprived Spin of a liberty interest. *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895-96 (1961). "[G]overnment[ ] adverse action" that "formally or automatically excludes" a person "from some category of work" deprives a person of a liberty interest. *Campbell v. District of Columbia*, 894 F.3d 281, 289 (D.C. Cir. 2018). Likewise, businesses—like Spin—have a liberty interest in pursuing their chosen trade or profession. *See, e.g.*, *Greene v. McElroy*, 360 U.S. 474, 492 (1959); *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) (such liberty interest applies to business entities as well as individuals).

111.    Here, the denial of Spin's application—which categorically excludes it from continuing to do business in the District, as it has for the past six years—constitutes an infringement of its liberty interest.

112.    The District's deprivation is wholly unjustified, and is arbitrary and capricious for the reasons set forth above.

113.    Those reasons include, namely, that the DDOT did not provide the actual scoring rubric to Spin, which was ultimately the scoring rubric that was used in scoring Spin's application.

114.    Furthermore, DDOT did not disqualify Bolt for its failure to conduct its mandatory in-person demonstration on November 4, 2024 as originally required by DDOT's published materials, and had DDOT followed its own stated rules, Bolt would be disqualified, and Spin would have received the second highest score and been awarded a permit.

115.    As a result, Spin has been deprived of its liberty interest without any rational basis.

116.    Not only did the DDOT deprive Spin of its ability to continue to do business without any rational basis, but it also did so without providing Spin *procedural* due process. The Fifth

Amendment's due process procedural protections ensure Spin has adequate notice and a full opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

117.    Here, as explained above, Spin did not receive adequate instruction as to what the true scoring rubric would be; thus, the scores it received were not commensurate with a full opportunity to be heard, as they never received the "factual basis for the action and the opportunity to rebut the evidence supporting that action" which "are essential components of due process." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014).

118.    And then, when presented with this evidence, Hearing Officer Calmeise ignored the evidence and otherwise stated that she would not consider any arguments pertaining to DDOT's preferential treatment of Bolt.  She also completely ignored evidence Spin put forth to show the DDOT's erroneous scoring.

119.    Further, throughout the appeal process, Spin repeatedly requested documents and information relevant to its appeal; but DDOT consistently refused to share the requested information, thereby hamstringing Spin's ability to present its case to Hearing Officer Calmeise. *See Greene v. McElroy*, 360 U.S. 474, 496-97 (1959) ("[I]n all types of cases where administrative and regulatory actions [a]re under scrutiny," "the evidence used to prove the Government's case must be disclosed to the [regulated] individual so that he has an opportunity to show that it is untrue.").

120.    And finally, Hearing Officer Calmeise denied Spin the ability to have an evidentiary hearing. This was a patent rejection of directly applicable evidence that went to a deprivation of Spin's constitutional rights, and thus deprived Spin of an opportunity to respond to evidence upon which the DDOT purportedly relied to make its decision to reject Spin's application. Indeed, it shows that she made her recommendation in a vacuum without providing

Spin a full and fair opportunity to present all relevant evidence or even consider Spin's arguments. Furthermore, her cursory treatment of Spin's arguments evidences a failure of DDOT to adequately explain itself for the denial of Spin's application.

**COUNT III**
**Equal Protection**

121.     Spin incorporates by reference the allegations in the preceding paragraphs of this Verified Complaint as if fully rewritten herein.

122.     The Fourteenth Amendment's equal protection clause applies to the District of Columbia via the Fifth Amendment's due process clause. *Creese v. District of Columbia*, 281 F.Supp.3d 46, 52 n.2 (D.D.C. 2017) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)).

123.     The Fourteenth Amendment's Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Thus, in essence, the Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985).

124.     For the reasons set forth above, these rights were simply not afforded to Spin for a myriad of reasons.

125.     For one, all applicants were required to complete an in-person device demonstration, and the DDOT made it abundantly clear that no extensions would be provided for this demonstration. And yet, it gave Spin's competitor—Hopp by Bolt—precisely that, when it allowed Bolt to delay its in-person demonstration eight days after the mandatory deadline. Second, as a condition of the application, all applicants were required to launch operations on a particular date. Similar to the extension for the in-person demonstration, however, Hopp by Bolt received an additional grace period to launch operations after January 1, 2025. And lastly (and perhaps most

18

egregiously) the DDOT used a different scoring rubric than what was initially published, and even provided that rubric to other applicants without sharing that same rubric with Spin.

126.     As evidenced here, all of these instances of disparate treatment are independent violations of the Equal Protection Clause—and with zero reason for that disparate treatment, given that Spin is a direct competitor to the other applicants and thus on equal ground with each of them.

127.     As there is no rational basis for this disparate treatment, the DDOT's actions have run afoul of the Equal Protection Clause. *See Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008); *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000).

<u>**COUNT IV**</u>
<u>**Injunctive Relief**</u>

128.     Spin incorporates by reference the allegations in the preceding paragraphs of this Verified Complaint as if fully rewritten herein.

129.     In not awarding Permits to Spin, DDOT failed to properly follow its own rules and policies, acted arbitrarily and capriciously, and ultimately abused their discretion.

130.     Spin has no adequate remedy at law and will suffer immediate and irreparable harm if an injunction is not granted.

131.     For example, in light of the Final Decision, Spin must begin removing its fleet of e-scooters and bikes from the District imminently, before the April 6th deadline.

132.     This will result in lost revenue if Spin can no longer operate in the District.

133.     Spin will be reputationally harmed by DDOT's decision in the form of lost good will with customers.

134.     Spin will also be forced to lay off numerous salaried employees, while losing its ability to compete in the District's micromobility market. Spin's customers would quickly

download other providers' applications and delete Spin's application, leading to permanent loss of customers.

135. No harm will result to others by the grant of an injunction because Spin is not seeking to preclude other shared fleet device companies from operating in the District—Spin merely seeks to continue its operations as it has done for the past six years.

136. The public interest will in fact be served by issuing an injunction because maintaining the status quo and allowing Spin to operate in the District will benefit the District's residents who rely on Spin's transportation on a daily basis to commute to work, access necessary goods and services, and for leisure.

137. Particularly, an injunction will benefit low-income riders, who make up 5.78% of all Spin trips through Spin's Low Income Customer Plan.

138. Excluding Spin from the District would deprive low-income residents of free transportation.

139. Separately, there is a substantial public interest in an agency's fair administration of government programs.

140. This includes preventing a monopoly in an industry and allowing the public to exercise free choice in a competitive market: DDOT's decision will result in a single operator being granted 86% of the shared scooter fleet available in the District, limiting competition and effectively creating a monopoly.

141. Spin is entitled to a temporary restraining order and a preliminary and permanent injunction to restrain Defendants from (i) denying Spin's Applications and (ii) precluding Spin from continuing its operations in the District.

## COUNT V
## Declaratory Judgment

142.     Spin incorporates by reference the allegations in the preceding paragraphs of this Verified Complaint as if fully rewritten herein.

143.     There exists between Spin and Defendants a real and justiciable controversy.

144.     Speedy relief is necessary to preserve Spin's rights.

145.     Spin is entitled to declaratory judgment that the non-award of Permits to it constitutes a violation of Spin's rights under DDOT's explicit rules and procedures.

146.     Spin is entitled to declaratory judgment that Permits for operations of Shared Fleet Devices in the District should have been awarded to Spin.

147.     Spin is entitled to declaratory judgment that Defendants' non-award of Permits at issue to Spin was an abuse of discretion.

## CONCLUSION

WHEREFORE, Spin prays for:

A.  A temporary restraining order and preliminary injunction preventing Defendants from enforcing 24 DCMR 3318.6, 24 DCMR 3318.7, or any other consequence against Spin for failing to remove or disable its devices from or in public rights-of-way during the pendency of this litigation;

B.  A temporary restraining order and preliminary injunction preventing Defendants from excluding Spin from operating in the District during the pendency of this litigation;

C.  A declaration that Defendants' actions in denying Spin's application were unlawful and unconstitutional;

D.  A permanent injunction preventing Defendants from excluding Spin from operating in the District in 2025 and 2026;

E.  A permanent injunction ordering Defendants to award Permits to Spin;

F.  An award of costs and fees, including attorneys' fees, as may be available under law; and

G.  Such other and further relief as the Court deems just and proper.

Respectfully submitted,

HUSCH BLACKWELL LLP

*/s/ Hal J. Perloff*
Hal J. Perloff (DC Bar #461716)
1801 Pennsylvania Avenue, NW, Suite 1000
Washington, DC 20006-3606
Telephone: (202) 378-2354
Facsimile: (202) 378-2319
hal.perloff@huschblackwell.com

and

Michael Klebanov (*admission forthcoming*)
1801 Pennsylvania Ave., NW, Suite 1000
Washington, D.C. 20006-3606
Telephone: (202) 378-2363
Facsimile: (202) 378-2319
michael.klebanov@huschblackwell.com

## **JURY DEMAND**

Plaintiff Pheenix USH LLC d/b/a Spin hereby demands a jury on all issues triable to a jury.

/s/ Hal J. Perloff
Hal J. Perloff

## VERIFICATION

I, JOHN LANKFORD, am over the age of eighteen years. The statements and allegations included in the foregoing Verified Complaint are based upon reports and information known to me, provided to me by Plaintiff, and/or furnished to me and that I declare under penalty of perjury that everything represented herein is true to the best of my knowledge, information and belief.

Dated: March 27 , 2025

_____
JOHN LANKFORD