## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PHEENIX USH LLC**<br>**D/B/A SPIN**<br>382 NE 191st St PMB 20388<br>Miami, FL 33179,<br><br>      Plaintiff,<br> v.<br><br>**DISTRICT DEPARTMENT OF**<br>**TRANSPORTATION**; and **SHARON**<br>**KERSHBAUM**, **KAREN CALMEISE,**<br>**TED RANDELL, WILLIAM FEENEY,**<br>and **AARON GOLDBECK**, in their official<br>capacities.<br>250 Main Street SE<br>Washington, DC 20003,<br><br>      Defendants. | Case No. 1:25-cv-00922<br><br>Judge _____<br><br><br><br>**APPLICATION FOR TEMPORARY**<br>**RESTRAINING ORDER AND**<br>**PRELIMINARY INJUNCTION** |

Pursuant to Federal Rule of Civil Procedure 65(b), Plaintiff Pheenix USH LLC d/b/a Spin ("Spin") moves the Court for a temporary restraining order and preliminary injunction against Defendants, The District Department of Transportation, Sharon Kershbaum, Karen Calmeise, Ted Randell, William Feeney, and Aaron Goldbeck (collectively "DDOT"), ordering that Defendants are temporarily restrained and preliminary enjoined from compelling Spin to cease micromobility operations in the District of Columbia.

The grounds for this Application are set forth in the accompanying Memorandum in Support.

## MEMORANDUM IN SUPPORT

## INTRODUCTION

Just two days ago, the District Department of Transportation ("DDOT") took the extraordinary step of kicking out one of the District's long-term providers of mobility solutions valued by the public, Plaintiff Pheenix USH LLC d/b/a Spin ("Spin"). DDOT has commanded Spin to remove its mobility devices, upon which Spin and the public will immediately suffer. Spin will lose customers, face harm to its reputation, and have to lay off employees, while the public will lose access to mobility options and be left subject to a monopolist. By contrast, the status quo—allowing Spin to continue to operate as it has been for the past six years, while the merits of this case are resolved—would harm no one. Accordingly, Spin requests a temporary restraining order—or, at minimum, an administrative stay—**by Wednesday, April 2**.

Specifically, DDOT denied Spin's application for a renewed permit to continue to operate shared micromobility services within the District. This decision was unlawful in several respects, and Spin is entitled to immediate relief for the following reasons:

*First*, DDOT's denial resulted from the use of secret scoring criteria, blatant bias toward other applicants, failure to consider key issues, and general administrative sloppiness. By refusing to follow its own explicit rules and statutory authority, DDOT acted arbitrarily and capriciously in its administration of the permit application process, while also violating constitutional protections of due process and equal protection.

*Second*, Spin is already suffering irreparable harm. Throughout its six years in the District, Spin has established a strong community of customers as well as W-2 employees. Absent an injunction, Spin would face more than economic harm—it would face harm to its good will and reputation, would be forced to lay off numerous employees, and would lose its ability to compete

in the micromobility market. Customers would quickly download other providers' applications and delete Spin's application, leading to permanent loss of customers.

*Third*, the equities and public interest favor injunctive relief. At the outset, low-income District residents rely on Spin for free transportation on a daily basis pursuant to Spin's Low Income Customer Plan. Separately, the public has a strong interest not only in micromobility services in the District specifically, but also in the fair and proper administration of agency permit programs broadly. What's more, consumers are injured when they lose access to the ability to exercise free choice in the market: removing Spin from the District lessens consumers' options, gives one operator a monopoly of **86%** of the market, and will have unprecedented economic implications in the District.

The Application should be granted. The DDOT has commanded that Spin begin removing its devices immediately, with a complete removal of its fleet of over 4,000 devices by April 9, 2025. As a practical matter, Spin needs relief **on or before April 2**, or else it would not have the time necessary to locate and remove its fleet of devices in a responsible manner.

## FACTUAL BACKGROUND

Spin provides micromobility services for shared e-bikes and e-scooters in cities and universities throughout the United States, including the District of Columbia. Ver. Compl. ¶ 2. The District Department of Transportation is an agency of the government of the District that manages and maintains publicly owned transportation infrastructure in the District. *Id.* ¶ 4. Defendants Randell, Feeney, and Goldbeck are DDOT employees who served as reviewers for the 2025-2026 permit application process. *Id.* ¶ 5. Defendant Calmeise is the DDOT Hearing Officer responsible for considering and deciding permit disputes and appeals. *Id.* ¶ 6. Defendant Kershbaum is the

DDOT Director with final authority to adopt or reject a Hearing Officer's appeal determinations. *Id.* ¶ 7. All Defendants are referred to collectively as "DDOT."

Plaintiff Pheenix USH LLC d/b/a Spin ("Spin") has operated in the District of Columbia for over six years. *Id.* ¶ 11. During this time, Spin has been a leader in the micromobility industry: it has pioneered new safety technologies, improved the District's workforce by hiring residents as W-2 employees, and provided quality transportation options for District residents. *Id.* ¶ 12. In the past two years, Spin's level of service and commitment to the community has only improved; for example, Spin has expanded its services to low-income patrons through its Low Income Customer Plan, which provides District residents with free transportation to commute to work, access necessary goods and services, and for leisure. *Id.* ¶ 13. To be sure, Spin has undoubtedly become a fixture in the District community, and District residents—regardless of income level—rely on Spin's services on a daily basis. *Id.* ¶ 14.

Despite this, the DDOT denied Spin's 2025-2026 applications to operate electronic mobility devices and shared fleet bicycles in the District. *Id.* ¶ 17. After, DDOT's Hearing Officer, Defendant Karen Calmeise, issued recommended decisions denying Spin's appeals. *Id.* ¶ 20. Ultimately, DDOT Director, Defendant Sharon Kershbaum, adopted Calmeise's decisions. *Id.*

## I.    2025-2026 Permit Application Requirements, Instructions, and Published Scoring Rubric.

DDOT, through a permit application process, awards Shared Fleet Device Permits so that operators can offer shared fleet devices for rental in the public right-of-way in the District. *Id.* ¶ 23. DDOT offers two types of permits: Permit A is for shared fleet devices limited to Electric Mobility Devices, and Permit B is for shared fleet devices limited to Shared Fleet Bicycles. *Id.* ¶ 24. Each permit applicant may be awarded one of each permit type per cycle. Since 2019, Spin has applied for—and been awarded—both Permit A and B Permits so that it can offer its electric

mobility device and bicycle services in the District. *Id.* ¶ 15.

In October 2024, DDOT began accepting permit applications for the 2025-2026 Shared Fleet Device Permits. *Id.* ¶ 25. As part of this process, DDOT published a document titled "Administrative Issuance: Shared Fleet Device Permit Application," (the "Permit Application Instructions") which provided instructions for application submissions, including pertinent dates, requirements, and scoring guidelines. *Id.* ¶¶ 26-27 and Exhibit A attached thereto. Moreover, DDOT provided a list of answers to commonly asked questions by other applicants ("Permit Application Q&A") to clarify the requirements of the application process. *Id.* ¶¶ 28-29 and Exhibit B attached thereto.

Among the Permit Application Instructions was the requirement that all applicants complete an in-person device demonstration on November 4, 2024. *Id.* ¶ 30 and Ex. A thereto at § 1.3. This demonstration was mandatory, meaning if an applicant did not attend the November 4 demonstration, their application would be disqualified pursuant to the Permit Application Instructions. *Id.* ¶ 31 and Ex. A thereto at § 1.3.   This guidance was reiterated on DDOT's shared mobility website. *Id.* ¶ 32. Further, the Permit Application Q&A provided that extensions to application deadlines would not be granted, as it would "jeopardize DDOT's timely completion of application review and scoring . . . to issue permits in accordance with the required January 1st start." *Id.* ¶ 33 and Ex. B thereto at No. 9. According to the 2025 Permit Operator Agreement, the Permit Holder must immediately serve the entire District on the first day of permitted operations. A permit holder's failure to launch within thirty days would "result in immediate permit revocation." *Id.* ¶¶ 34-35 and Exhibit C attached thereto.

Additionally, the Permit Application Instructions explained that "[a]pplicants are graded on their understanding of and commitment to the program's regulatory requirements and evidence

of effective prior performance in the District[.]" *Id.* ¶ 37 and Ex. A thereto at § 2.4. To this end, DDOT provided a scoring rubric that would be used by DDOT reviewers. *Id.* ¶ 36. Under the published scoring rubric, each question was worth up to four points, and points were to be assigned to each question as follows:

> For each question*:
>
> - 0 ratings fail to meet the criteria established in the regulations or offer solutions that may worsen or create additional challenges and/or limitations to fulfilling the respective criteria.
> - 1 ratings meet the minimum regulatory standards and offer rudimentary solutions, claim the minimum level of commitment and ability to solving known challenges and concerns.
> - 2 ratings meet the minimum regulatory standards and offer basic or typical, but unexceptional solutions, claiming a moderate level of commitment and ability to solving known challenges and concerns.
> - 3 ratings significantly exceed the minimum requirements or display more detailed approaches demonstrating (with specific testing, demonstrations, or research and development) a higher level of commitment to solving known challenges and concerns.
> - 4 ratings substantially exceed the minimum requirements, display unique or innovative approaches demonstrating (with specific case studies, past performance, or independently verifiable data) the highest level of commitment and ability to solving known challenges and concerns, and have been exhibited effectively in the District or other markets.

*Id.* ¶ 38 and Ex. A thereto at § 2.4.

## II.    DDOT's Administration of the 2025-2026 Permit Application Process.

### A.    DDOT violates its instructions and guidance and allows Hopp by Bolt a private in-person demonstration *after* DDOT's mandatory permit application deadline and to delay launching operations in the District.

During the application process, DDOT granted Hopp by Bolt ("Bolt"), a company with no previous experience in the District or North America, an extension of time to conduct its demonstration and begin operations in the District. *Id.* ¶ 40. An email from Bolt to DDOT illustrates that Bolt was allowed to delay its in-person demonstration and receive a private demonstration on November 12, 2024. *Id.* ¶¶ 41-42 and Exhibit D attached thereto. And at the pre-

conference hearing on December 16, 2024, DDOT conveyed to Spin that Bolt received an additional grace period to launch operations after January 1, 2025. *Id.* ¶ 44.

**B.      DDOT used an unpublished, secret scoring rubric to score permit applications.**

On November 5, 2024, DDOT reviewer Ted Randell, in an email to the other reviewers, indicated that applications should instead be scored using an unpublished rubric. *Id.* ¶¶47-48 and Exhibit E attached thereto. Randell's email stated:

> A score of '2' will effectively be an "average" score, where the operator is restating a requirement or simply meeting the standards of the industry or offering examples of previous solutions or outcomes that are unexceptional. 3s and 4s should be given only when an operator can effectively exhibit "higher" or "highest" level of commitment and has some proof to back it up, rather than simply promising an outcome.

*Id.* ¶¶ 49-50 and Ex. E attached thereto. This unpublished rubric required an applicant to meet the "standards of the industry" to receive a 2 score, and required an applicant to exhibit a "higher level of commitment" and have "some proof to back it up" to receive a 3 score. *Id.* ¶ 52 and Exs. A and E attached thereto.

**III.   Denial of Spin's Permit Applications and Subsequent Appeals.**

In line with the requirements laid out in the Permit Application Instructions and explained in the Permit Application Q&A, Spin submitted Permit A and Permit B Applications (the "Applications") on October 31, 2024. *Id.* ¶ 63. On November 15, 2024, Spin received notice from DDOT that it would not be awarded Permit A or Permit B. *Id.* ¶ 64. The notice explained that Spin received a score of 374 out of 624 for its Permit A Application and a score of 363 out of 624 for its Permit B Application. *Id.* ¶ 65. These scores ranked Spin as the 3rd highest scoring applicant out of eight total applicants for both its Permit A and Permit B Applications. *Id.* ¶ 66.

On November 27, 2024, Spin submitted its appeals of the Permit denials, citing improper scoring of its Applications ("First Appeals"). *Id.* ¶ 67.  After submitting its First Appeals, Spin

uncovered more information regarding the permit application process, including DDOT's use of the unpublished scoring rubric, more instances of improper scoring, and preferential treatment of other applicants. *Id.* ¶ 68. For example, Spin's Amended Appeals described how the use of the unpublished rubric resulted in at least twenty-six instances of improper scoring across Spin's Permit A and Permit B applications. Based on this information, Spin sent Calmeise a letter requesting an evidentiary hearing regarding the denial of its Applications. *Id.* ¶¶ 69-70 and Exhibit F attached thereto. Calmeise denied Spin's request, explaining that an in-person hearing was unnecessary because "the issues for . . . determination are not dependent on credibility or need to view witness testimony" and that "all necessary documents and responses have been submitted." *Id.* ¶¶ 72-73 and Exhibit G attached thereto. Following this, Spin submitted a second set of appeals (the "Amended Appeals"), spanning 144 pages, for both Permit A and Permit B on January 17, 2025. *Id.* ¶ 74.

On March 11, 2025, Calmeise issued her recommended decisions denying Spin's Amended Appeals (the "Recommended Decisions"). *Id.* ¶¶ 75-76 and Exhibits H and I attached thereto. Calmeise stated in the Recommended Decisions that she would not consider any arguments pertaining to DDOT's preferential treatment of Bolt, as they were not subject to her review authority under the District of Columbia Municipal Regulations. *Id.* ¶ 77 and Exs. H and I attached thereto. The regulations provide that a Hearing Officer has review authority over DDOT where it:

    i.     improperly or mistakenly applied the scored criteria to the appellant's original application,

    ii.    made a mistake in analyzing or calculating an applicant's final score (or a component thereof), or

    iii.   improperly deemed an application as incomplete.

24 DCMR 3317.8.

Additionally, Calmeise stated that the unpublished scoring criteria did not significantly differ from the published criteria as listed in the Permit Application Instructions, because Spin's position regarding improper scoring "does not support the overall intention to provide exemplary services to the district." *Id.* ¶ 80 and Exs. H and I attached thereto.

Kershbaum adopted the Calmeise's Recommended Decisions on March 26, 2025 (the "Final Decision"). *Id.* ¶¶ 81-82 and Exhibit J attached thereto. The Final Decision provides that Spin must remove all its devices from the public right of way within 72 hours. *See also* 24 DCMR 3318.6. If Spin were to fail to remove its devices within that time, then Defendants could impound Spin's devices and block Spin from obtaining any additional permit for a two-year period. 24 DCMR 3318.7. On March 27, DDOT alerted Spin that it would delay enforcing the 72-hour removal requirement until April 6, "as long as Spin is demonstrating efforts to remove devices" and displaying "downward deployment trends." Ver. Compl. ¶¶ 84-85 and Exhibit K attached thereto. To that end, Spin must begin removing its fleet imminently, and well prior to April 6, 2025. *Id.* ¶ 86.

## STANDARD OF REVIEW

The standard for a temporary restraining order is the same as that for a preliminary injunction. *Singh v. Carter*, 168 F. Supp. 3d 216, 223 (D.D.C. 2016). Both types of injunctive relief may be granted upon a balancing of the following four factors: (1) a likelihood of success on the merits; (2) that plaintiff would suffer irreparable injury if the injunction is not granted; (3) that the balance of the equities favors an injunction; and (4) that the public interest would be served by the injunction. *Id.*

Under this test, no single factor is dispositive; rather, all four "interrelate on a sliding scale and must be balanced against each other." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18

(D.C. Cir. 1998). If the balance of hardships tips toward a plaintiff, the plaintiff needs only "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).  And, where a plaintiff brings multiple claims, the plaintiff only needs to show a likelihood of success on one of claims to obtain injunctive relief. *See Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 27 (D.D.C), *appeal filed*, No. 24-7059 (D.C. Cir. 2024); *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 250 (D.D.C. 2003).

## ARGUMENT

Each of the four factors for issuing injunctive relief supports Spin here.

## I.      Spin is likely to prevail on the merits of its claims.

Spin's Complaint shows it has a likelihood of success on the merits of its claims—or, at very minimum, "raise[s] questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Holiday Tours*, 559 F.2d at 844.

Here, Spin has shown a high likelihood of success because the DDOT's administration of the 2025-2026 permit application process lacked substantial evidence, misinterpreted the governing law, and was otherwise unreasonable, arbitrary, and capricious. And this is not just Spin's own say-so; the terms of Defendants' own Permit Application Instructions prove Spin was entitled to the Permits.

### A.      The DDOT's decision to deny Spin a permit was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

This Court may overturn an agency decision if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Bowles v. D.C. Dep't of Emp't*

*Servs.*, 121 A.3d 1264, 1269 (D.C. 2015); *McNeal v. D.C. Dep't of Emp't Servs.*, 917 A.2d 652, 656 (D.C. 2007). Although a court's "review of agency decisions is deferential, it is by no means toothless." *Alston v. D.C. Dep't of Emp't Servs.*, 314 A.3d 58, 64 (D.C. 2024). Rather, the court must "assure that the agency has given full and reasoned consideration to all material facts and issues." *Id.* (emphasis added) (internal quotation marks omitted). "The court can only perform this function when the agency discloses the basis of its order by an articulation with reasonable clarity of its reasons for the decision." *Id.*

Spin's claim is likely to succeed. DDOT's administration of the 2025-2026 permit application process was arbitrary, capricious, and an abuse of discretion for several reasons:

- DDOT acted arbitrarily and capriciously and failed to abide by its own stated requirements when it granted preferential treatment to another applicant.

- DDOT acted arbitrarily and capriciously, committed an error of law, and applied the wrong legal standard when it used a secret, unpublished scoring criteria to evaluate permit applications that was materially different from the published scoring criteria.

- The Hearing Officer acted arbitrarily and capriciously and committed an error of law when she improperly ignored several of Spin's appeal arguments on appeal as "outside of her review authority," such as DDOT's preferential treatment of other applicants.

- The Hearing Officer's acted arbitrarily and capriciously when it ignored evidence in Spin's Amended Appeals regarding the Reviewers' improper scoring.

- The Hearing Officer arbitrarily and capriciously refused Spin's request for an evidentiary hearing.

Due to the improper administration of the permit application process, DDOT's decisions should be set aside.

1.     **DDOT acted arbitrarily and capriciously and failed to abide by its own stated requirements when it granted preferential treatment to another applicant.**

"An agency . . . acts arbitrarily and capriciously if it fails to treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 78-9 (D.D.C. 2015). Here, DDOT afforded Bolt preferential treatment by (i) allowing for a private in-person demonstration *after* the mandatory deadline dictated by DDOT's own guidance (without offering similar accommodations to other applicants, to boot) and (ii) allowing for a grace period to launch operations after the date required by the Permit Operator Agreement. Ver. Compl. ¶¶ 41, 44. These facts illustrate that DDOT's administration of the permit evaluation process was arbitrary and capricious to the detriment of compliant applicants and the public interest.

As part of the 2025-2026 permit application process, all applicants were required to complete an in-person device demonstration. *Id.* ¶ 30. The Permit Application Instructions explicitly stated that the demonstration must be completed on November 4, 2024. *Id.* ¶ 31 and Ex. A attached thereto at § 1.3. This was a hard deadline and listed as a clearcut pass/fail requirement of the permit application; in fact, DDOT guidance further explained that no extensions would be granted because extensions would "jeopardize DDOT's timely completion of application review and scoring . . . ." *Id.* ¶¶ 31, 33 and Ex. B attached thereto at No. 9. Additionally, after the permits were rewarded, the 2025 Permit Operator Agreement required awardees to begin operations on January 1, 2025, and stated that "[f]ailure to launch within thirty (30) days of permit start will result in immediate permit revocation." *Id.* ¶ 34 and Ex. C attached thereto.

Despite these clear and reiterated requirements, Bolt was afforded preferential treatment twice during its permit application process. *First*, an email from Bolt to DDOT illustrates that Bolt

was permitted to delay its in-person demonstration and receive a private demonstration on November 12, 2024, eight days after the mandatory deadline. *Id.* ¶ 41. *Second*, at a pre-conference hearing on December 16, 2024, DDOT conveyed to Spin that Bolt received an additional grace period to launch operations after January 1, 2025. *Id.* ¶ 44.

In granting Bolt preferential treatment, DDOT failed to "treat similar cases in a similar manner." *XP Vehicles, Inc.*, 118 F. Supp. 3d at 78-9. This unjustified and unexplained disparity in treatment constitutes arbitrary and capricious administration of the permit application process. *See id.* at 79 (explaining that "[p]laintiffs' fact-based contention that the [administrative agency's program] was run in an ad hoc manner [was] sufficient to state a claim under the APA for arbitrary and capricious agency action").

To make matters worse, DDOT did not even bother to disclose this preferential treatment to other applicants. Ver. Compl. ¶ 43. The remaining seven applicants all completed their demonstrations on November 4, 2024, as required by DDOT's instructions. None of the other applicants were offered any sort of accommodation—like a private demonstration, for example— during the entire permit application process. Not only is this arbitrary and capricious but illustrates an "ad hoc" administration of the permit application process. *XP Vehicles, Inc.*, 118 F. Supp. 3d at 79. Simply put, DDOT harmed compliant applicants and injured the public interest by not disqualifying an applicant that clearly did not meet the permit application requirements. If DDOT had not acted arbitrarily and instead followed their own application rules, Bolt would have been disqualified, giving Spin the second highest score for Permit A and a permit for 2025-2026.

Further, "[a]n agency must follow its own rules, procedures, and policies." *Wilmina Shipping AS v. United States Dep't of Homeland Sec.*, 75 F. Supp. 3d 163, 173 (D.D.C. 2014); *see also Basic Media, Ltd. v. F.C.C.*, 559 F.2d 830, 833 (D.C. Cir. 1977) ("[W]hen an agency decides

to make an exception to the general rule, it is also subjecting itself to careful scrutiny by a reviewing court . . . ."). Here, DDOT ran afoul of its stated requirements numerous times when it exercised preferential treatment to Bolt by allowing a late in-person demonstration and a delayed launch of operations. *First*, DDOT violated its stated Permit Application Instructions, which contained the published guidance to permit applicants and required an in-person demonstration on November 4, 2024. Ver. Compl. ¶ 92. *Second*, DDOT violated the guidance provided on its shared mobility website, which stated that November 4 was "mandatory device demo day." *Id. Third*, DDOT violated its guidance provided in the Permit Application Q&A, which explicitly provided that extensions will not be granted because extensions would "jeopardize DDOT's timely completion of application review and scoring . . . to issue permits in accordance with the required January 1st start." *Id. Finally*, by granting Bolt an extension, DDOT violated the 2025 Permit Operator Agreement, which stated that the Permit Holder must begin operations on January 1. *Id.* This is a clear violation of D.C. administrative law. *See Doe v. Mamsi Life and Health Inc. Co.*, 471 F. Supp. 2d 139, 148 (D.D.C. 2007) (explaining that once an agency adopts a criterion, it is bound to apply them "honestly and consistently," and a failure to do so is arbitrary and capricious).

> **2. DDOT acted arbitrarily and capriciously, committed an error of law, and applied the wrong legal standard when it used a secret, unpublished scoring criteria to evaluate permit applications that was materially different from the published scoring criteria.**

DDOT's preferential treatment for Bolt is only the tip of the arbitrary-and-capricious iceberg. Separately and more fundamentally, DDOT applied the wrong legal standard in scoring Spin's application. DDOT's regulations set forth specific scoring criteria. *See* Ver. Compl. ¶ 38 and Ex. A thereto at § 2.4. These are the standards that Spin thought it would be evaluated under, and it prepared its application accordingly. But those are not the standards DDOT actually applied to Spin. Instead, DDOT—entirely in secret, with no notice to Spin—devised and applied a separate

set of criteria, untethered to the published criteria. This is textbook arbitrary-and-capricious action. It cannot stand.

An agency's decision is necessarily an arbitrary and capricious and an "abuse of discretion if the agency has applied an incorrect legal standard in making its decision." *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 109 (D.D.C. 2018). Put otherwise, when an agency "ignore[s], misappl[ies], or inconsistently appl[ies] its own criteria," it is "almost by definition . . . arbitrary and capricious." *Doe*, 471 F. Supp. 2d 139, 148 (D.D.C. 2007). Here, DDOT ignored and inconsistently applied its scoring criteria, instead applying a different, secret scoring rubric that directly contradicted the Permit Application Instructions. This deviation from the published criteria rendered DDOT's denial of Spin's permit applications arbitrary and capricious.

Recently, a federal court found in favor of Spin when the City of Columbus similarly abused its discretion and acted arbitrarily. There, the City of Columbus considered unannounced criteria and disregarded announced criteria in considering bid proposals. The district court found that this was sufficient to show a likelihood of success on the first factor for injunctive relief and, ultimately, granted Spin's request for a TRO. *See Phoenix USH LLC v. City of Columbus*, No. 2:24CV04290, ECF 16, at p. 15 (Dec. 31, 2024), attached hereto as Exhibit 1 (granting Spin's motion for TRO and explaining that "[r]ejecting a bid based on unannounced criteria may be arbitrary enough to constitute an abuse of discretion.").

This would not be the first time a court has found DDOT acted arbitrary and capriciously in its scoring of applications to operate shared mobility devices. In a very similar case a few years ago, DDOT applied its scoring criteria inconsistently, which the D.C. court held was the "hallmark of an arbitrary and capricious decision." *Bird Rides, Inc. v. D.C. Dept of Transp.*, No. 2023-CAB-00316, at p. 11 (D.C. Super. Ct. Sept. 20, 2023).

15

Here, the Permit Application Instructions provided to the permit applicants included the published rubric to be used by DDOT reviewers:

> For each question*:
>
> - 0 ratings fail to meet the criteria established in the regulations or offer solutions that may worsen or create additional challenges and/or limitations to fulfilling the respective criteria.
> - 1 ratings meet the minimum regulatory standards and offer rudimentary solutions, claim the minimum level of commitment and ability to solving known challenges and concerns.
> - 2 ratings meet the minimum regulatory standards and offer basic or typical, but unexceptional solutions, claiming a moderate level of commitment and ability to solving known challenges and concerns.
> - 3 ratings significantly exceed the minimum requirements or display more detailed approaches demonstrating (with specific testing, demonstrations, or research and development) a higher level of commitment to solving known challenges and concerns.
> - 4 ratings substantially exceed the minimum requirements, display unique or innovative approaches demonstrating (with specific case studies, past performance, or independently verifiable data) the highest level of commitment and ability to solving known challenges and concerns, and have been exhibited effectively in the District or other markets.

Ver. Compl. ¶ 38 and Ex. A thereto at § 2.4. Notably, under the published criteria, to receive a "2" score, an applicant only needed to "meet the *minimum regulatory standards* and offer basic or typical, but unexpected solutions." To receive a "3" score, an applicant needed to "significantly exceed the minimum requirements or display more detailed approaches demonstrating a higher level of commitment to known challenges . . . ." *Id.*

In scoring Spin's application, however, DDOT reviewers did not apply those established standards. They instead applied different standards untethered to the published rules and undisclosed to Spin. *Id.* ¶ 47. The reviewers were utilizing an unpublished, secret rubric that provided a different standard for scoring each question. This secret rubric stated that to receive a "2" score, an operator must "meet[] the standards of the industry" and to receive a "3" or "4" score, an operator must exhibit " 'higher' or 'highest' level of commitment and have some proof to back

it up . . . ." *Id.* ¶¶ 49-50 and Ex. E attached thereto. The differences between the published rubric and the secret rubric include:

| Published Rubric (Page 7 of the Permit Application) | Secret Rubric (Ted Randell email) | Material Variation between Public and Secret |
| --- | --- | --- |
| "2 ratings meet the minimum regulatory standards and offer basic or typical, but unexceptional solutions, claiming a moderate level of commitment and ability to solve known challenges and concerns." | A score of '2' will effectively be an "average" score, where the operator is restating a requirement or simply meeting the standards of the industry or offering examples of previous solutions or outcomes that are unexceptional. | The published rubric awards a 2 for meeting "minimum regulatory standards," whereas the secret rubric requires the applicant to meet "the standards of the industry." |
| "3 ratings significantly exceed the minimum requirements or display more detailed approaches demonstrating (with specific testing, demonstrations, or research and development) a higher level of commitment to solving known challenges and concerns." | 3s should be given only when an operator can effectively exhibit "higher" level of commitment and has some proof to back it up, rather than simply promising an outcome. | The published rubric awards a 3 score if an applicant does *either* of two things: significantly exceeds the minimum requirements *or* displays detailed approaches demonstrating a higher level of commitment.<br><br>The secret rubric requires *both* a higher level of commitment "and some proof to back it up." |

How do we know that DDOT reviewers applied the secret criteria, instead of the actual published criteria the law required them to? Because they explicitly said as much—to each other, but never to Spin—in email correspondence. *Id.* ¶ 47 and Ex. E attached thereto. This in and of itself constitutes a violation of the District of Columbia's Code of Municipal Regulations. *See* DCMR Section 3317.4 ("A points-based scoring systems reflecting the criteria outlined in 3317.2 *will be included in an administrative issuance released in advance of the permit application being published*.") (emphasis added).

What's more, the secret rubric materially impacted Spin's scores. While each permit applicant should have been judged on its own merit (relative to the minimum regulatory requirements), by replacing "minimum regulatory requirements" with "industry standards,"—a term not even defined in the published rubric—DDOT introduced a level of comparison not contemplated by the published criteria because it judged Spin's responses relative to the responses and promise of other applicants. Ver. Compl. ¶¶ 53-54. Simply put, this difference matters: minimum regulatory standards are worlds apart from *industry* standards. Unlike regulatory standards, "industry standards" are not defined by D.C.'s Code but are open to various interpretations. Following instructions listed in the Permit Application, Spin submitted responses that specifically outline how they significantly exceed the minimum *regulatory* standards. Spin was never informed that they would instead be judged by a different standard. DDOT's deviation was arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (holding that an agency determination is arbitrary and capricious if the agency "relied on factors" it was "not intended it to consider").

Additionally, the secret rubric ignores the disjunctive quality of the published criteria's requirement to receive a 3, which provides that an applicant can *either* "significantly exceed the minimum requirements" *or* "display more detailed approaches demonstrating . . . a higher level of commitment. . . ." Ver. Compl. ¶ 55. This means, for example, that Spin could earn a 3 score by significantly exceeding minimum requirements. And there's no need to consider the detailed approaches or higher level of commitment. *See Scott v. United States*, 672 A.2d 579, 581 (D.C. 1996) (explaining that the word "or" is used, it "is presumed to be used in the disjunctive sense" absent clear intent to the contrary). But the secret rubric flipped this part of the published rubric on its head. It mandated a higher level of commitment and certain proof. By demanding Spin

demonstrate a "higher level of commitment," the reviewers effectively disregarded the published criteria. Ver. Compl. ¶¶ 57-58.

Thus, DDOT acted arbitrarily and capriciously when it ignored its published criteria in favor of the secret rubric, and this adversely affected the scoring of Spin's applications. In fact, DDOT's use of the secret rubric resulted in at least twenty-six instances of improper scoring across Spin's Permit A and Permit B applications. *Id.* ¶ 59. For example, in several cases, the reviewer commentary specifically referenced the "industry standard" as a justification for receiving a "2" score, when Spin should have been judged based on how its responses compared to "minimum regulatory requirements." DDOT's conduct is, once again, the "hallmark of an arbitrary and capricious decision." *Bird Rides*, No. 2023-CAB-00316, at p. 11.

> **3.** **Calmeise acted arbitrarily and capriciously and committed an error of law when she improperly ignored several of Spin's appeal arguments on appeal as "outside of her review authority," such as DDOT's preferential treatment of other applicants.**

The DDOT—in the appeal process—acted arbitrarily and capriciously by failing to follow its own rules. "An agency must follow its own rules, procedures, and policies." *Wilmina Shipping*, 75 F. Supp. 3d at 173. Agencies act arbitrarily and capriciously if their interpretation is "plainly erroneous or inconsistent with the regulation." *St. Vincent's Medical Center v. Burwell*, 222 F. Supp. 3d 17, 22 n.2 (D.D.C. 2016) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *see also Fina Oil & Chem. Co. v. Norton*, 332 F.3d 672, 676 (D.C. Cir. 2003) (explaining that agencies cannot "rewrite[e] regulations under the guise of interpreting them").

In its Amended Appeals, Spin described in detail DDOT's preferential treatment of Bolt as well as its impact on Spin's scores and the permit application process as a whole. Despite this, Calmeise stated in her Recommended Decisions (later rubber-stamped by the Director) that she would *not* consider these arguments, as they were not subject to her review authority:

> I further dismiss the complaints of bias (allegedly in favor of other mobility device applicant F) . . . because these concerns are not matters of miscalculation or mistake in the score ratings which are the sole issues to be reviewed in this Appeal process. I further find that the grounds for review of for this Appeal do not extend to complaints of other applicants application process.

Ver. Compl. ¶¶ 76-77 and Exs. H and I thereto at p. 8.

However, the District of Columbia Municipal Regulations clearly allows the Hearing Officer to consider such issues. The Hearing Officer has review authority over the DDOT where it:

    i.      improperly or mistakenly applied the scored criteria to the appellant's original application,

    ii.     made a mistake in analyzing or calculating an applicant's final score (or a component thereof), or

    iii.    improperly deemed an application as incomplete.

24 DCMR 3317.8.

Preferential treatment of another applicant clearly falls within (ii) of the Hearing Officer's review authority. Under (i), the Hearing Officer has authority where the DDOT "[i]mproperly or mistakenly applied the scored criteria to *the appellant's* original application." (emphasis added). Under (ii), by contrast, the Hearing Officer has authority where DDOT: "made a mistake in analyzing or calculating *an applicant's* final score (or a component thereof)." (Emphasis added.) "The appellant" and "an applicant" are different, indicating their meaning is different. *See BSA 77 P St. LLC v. Hawkins*, 983 A.2d 988, 999 (D.C. 2009) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended[.]"). "Applicant" is broader than "appellant" and includes *all* applicants— not just the appellant. Spin was the "appellant" here. Spin and Bolt were both "applicants." Thus, Spin could raise arguments about, and Calmeise should review, whether DDOT "made a mistake in analyzing or calculating *an applicant's*"—Bolt's—"final score (or a component thereof)."

(Emphasis added.) Calmeise's admitted failure to consider DDOT's preferential treatment of Bolt when it was clearly subject to her statutory review authority was both arbitrary and capricious and an error of law.

> **4.    Calmeise acted arbitrarily and capriciously when she ignored evidence in Spin's Amended Appeals regarding the Reviewers' improper scoring.**

Calmeise's blind acceptance of the secret rubric—and refusal to engage with its material variations from the published rubric—was arbitrary and capricious, too. "[A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action." *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010). What's more, an agency "disregard[s] entirely the need for reasoned decisionmaking" when it "fail[s] to reasonably reflect upon the information contained in the record and grapple with contrary evidence." *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017). Courts have "not hesitated to reject agency determinations" when an agency ignores evidence contrary to its position or "offered only [a] mere assertion that [its determination] accounted for contrary evidence." *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 68 (D.D.C. 2016) (quotation marks and alterations omitted) (citing cases).

In the 144 pages of its Amended Appeals, Spin dedicated substantial time explaining the variations between the published and secret rubrics, as well as how this meaningfully impacted Spin's scores. Calmeise did not meaningfully dispute or rebut these material variations in the scoring rubrics. Instead, the Recommended Decisions make leaps in logic to quickly conclude— within two paragraphs—that the published rubric and the secret rubric were consistent with one another. Ver. Compl. ¶¶ 79-80 and Exs. H and I attached thereto. This is not "reasoned decisionmaking" necessary to support an agency determination. *Innovator Enterprises, Inc. v.*

*Jones*, 28 F. Supp. 3d 14, 24 (D.D.C. 2014) (reversing agency action where the proffered explanation "contain[ed] very little reasoning or analysis" and thus failed to "articulate a satisfactory explanation" (cleaned up)); *cf. Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1363 (Fed. Cir. 2023) ("We agree that Commerce's explanation was insufficient. We are unable to conclude that Commerce even considered AGIS's argument, and Commerce's discussion is limited to a single paragraph that is vague and conclusory and wholly fails to explain why Commerce believed that using AGIS's dataset would be improper."); *D.C. v. United States Dep't of Agric.*, 496 F. Supp. 3d 213, 227 (D.D.C. 2020) (explaining that it is "arbitrary and capricious" for an agency to "fail[ ] to consider significant critical comments" made by an interested party).

The failure to recognize the variations between the published and secret rubrics is but one example of how the Recommended Decisions ignored evidence proffered by Spin regarding scoring. As explained above, DDOT adopted a secret rubric that (i) used materially different terms with different definitions than the published rubric to score applicants ("standard of the industry" versus "minimum regulatory requirements") and (ii) disregarded certain metrics articulated in the published rubric.[1] However, in her Recommended Decisions, Calmeise disregards this, and states that "the language in the Randell email is not a 'secret criteria' but is merely a restatement of the published score criteria." Ver. Compl. ¶ 80 and Exs. H and I attached thereto at p. 6. Calmeise proceeds to repeat the published criteria, which states that "[an] application will warrant a "3" score for the criteria that is either exceeding the minimum requirement OR presents detailed approaches demonstrating a higher level of commitment to solving known challenges and concerns." *Id.* But the plain language of the Randell email provides that 3s should be given only

---

[1] See discussion *supra* at pp. 12-16.

when an operator can effectively exhibit a 'higher' level of commitment and has "some proof to back it up," rather than simply promising an outcome. *Id.* ¶ 50 and Ex. E attached thereto. Calmeise treats this as a distinction without a difference. Not so. Randell's email does not contemplate the fact that an applicant can receive a 3 score by significantly exceeding the minimum requirements. He instead requires a higher level of commitment plus proof; the evidence is clear this is not simply a "restatement of the published score criteria."

Additionally, Calmeise disregarded the published criteria when she rejected Spin's argument that it should be judged according to "minimum regulatory standards"—in line with the published rubric—because, in her view, Spin's position "does not support the overall intention to provide exemplary services to the district." Ver. Compl. ¶ 80 and Exs. H and I attached thereto at p. 7. Not only does this conclusion ignore DDOT's stated rules and policies, *Wilmina*, 75 F. Supp. 3d at 173, but it is also in direct conflict with the language of the published rubric. This is undoubtedly arbitrary and capricious.

### 5.    Calmeise arbitrarily and capriciously refused Spin's request for an evidentiary hearing.

Additionally, an agency action that denies due process rights is arbitrary and capricious. *See Del Lab'ys, Inc. v. United States*, 86 F.R.D. 676, 681 (D.D.C. 1980) (holding that agency action that denied due process was arbitrary and capricious). Here, on December 30, 2024, Spin sent Calmeise a letter requesting an evidentiary hearing regarding the denial of its Applications. Ver. Compl. ¶¶ 69-70 and Exhibit F attached thereto. In the letter, Spin outlined the instances of arbitrary and capricious conduct, as detailed above, and explained that an evidentiary hearing was necessary to "obtain testimony from the [reviewers] regarding several issues, such as DDOT's policy regarding exceptions and the panelists' decision to not disclose [Bolt's] preferential treatment to other applicants." *Id.* ¶ 71 and Ex. F attached thereto. Notwithstanding this timely

23

request, Calmeise denied Spin's request and stated that an in-person hearing was unnecessary because "the issues for . . . determination are not dependent on credibility or need to view witness testimony" and that "all necessary documents and responses have been submitted." *Id.* ¶¶ 72-73 and Exhibit G attached thereto. Her refusal to provide a hearing appeared to be based, at least in part, on her arbitrary and capricious decision to ignore DDOT's preferential treatment of another applicant.

Calmeise's failure to provide Spin with an evidentiary hearing is yet another example of DDOT's arbitrary and capricious administration of the permit application process. [2]

### 6.    DDOT's arbitrary and capricious decisionmaking made a difference in the outcome of the application process.

DDOT's ad hoc administration of the permit application process was not without consequence; namely, it adversely impacted Spin's initial permit application scores as well as Spin's right to have its arguments be fully heard and considered on appeal. Absent DDOT's arbitrary and capricious decisionmaking at every stage of the permit application process, Spin would have been awarded two Permits and would not be facing irreparable harm.

*First*, DDOT's administration of the permit application process impacted Spin's initial scores. As explained above, DDOT's use of the secret rubric resulted in many instances of improper scoring across Spin's Permit A and Permit B applications. For example, across its Applications, Spin received six incorrect "1" scores based on the fact that Spin did not meet the "industry standard." In reality, based on the published score, Spin should have received at least a 2—and perhaps even a 3—score because Spin met the minimum regulatory standards and offered

---

[2] *See infra* Section I.B for discussion of how Calmeise's failure to conduct an evidentiary hearing violates Spin's due process rights.

more than rudimentary solutions to those questions. This alone would have raised Spin's Permit A score from 374 to 377 and Spin's Permit B score from 363 to 370. Ver. Compl. ¶¶ 61-63.

*Second*, Calmeise's failure to consider issues within her authority and failure to properly consider Spin's evidence resulted in the wrongful denial of Spin's Amended Appeals. In total, Spin submitted 144 pages extensively detailing both procedural and substantive issues with the application process which ultimately led to the denial of Spin's Applications. In her Recommended Decisions, Calmeise explicitly stated that she would not be considering large portions of the Amended Appeals, even portions that were directly within her review authority. And for the portions of the Amended Appeals that she did "consider" in the five pages of analysis in her Recommended Decisions, Calmeise gave unfettered—and undeserved—deference to DDOT reviewers. Ver. Compl. ¶¶ 77-80. The consequences of Calmeise's indifference are grave: Spin will be forced off the District's streets without a full and fair opportunity to truly have its Amended Appeals heard.

### B. DDOT violated Spin's due process rights.

The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. Here, the handling and subsequent denial of Spin's application has violated both the substantive and procedural provisions of the Due Process Clause.

DDOT's decision to kick Spin out of the District's micromobility market deprived Spin of a liberty interest. *Cafeteria & Rest. Workers Union, Loc. 473 v. McElroy*, 367 U.S. 886, 895-96 (1961). "[G]overnment[ ] adverse action" that "formally or automatically excludes" a person "from some category of work" deprives a person of a liberty interest. *Campbell v. District of Columbia*, 894 F.3d 281, 289 (D.C. Cir. 2018). Likewise, businesses—like Spin—have a liberty

interest in pursuing their chosen trade or profession. *See, e.g.*, *Greene v. McElroy*, 360 U.S. 474, 492 (1959); *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) (such liberty interest applies to business entities as well as individuals). Here, the denial of Spin's application—which categorically excludes it from continuing to do business in the District, as it has for the past six years—constitutes an infringement of its liberty interest.

The District's deprivation is wholly unjustified, and is arbitrary and capricious for the reasons set forth above. Those reasons include, namely, that the DDOT did not publish or provide the actual scoring rubric to Spin, which was ultimately the scoring rubric that was used in scoring Spin's application. Furthermore, Spin was not given the same amount of time as other applicants to put together their in-person demonstration, or as much time before they would be required to fully launch operations. As a result, Spin has been deprived of its liberty interest without any rational basis.

Not only did the DDOT deprive Spin of its ability to continue to do business without any rational basis, but it also did so without providing Spin *procedural* due process. The Fifth Amendment's due process procedural protections ensure Spin has adequate notice and a full opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

Here, as explained above, Spin did not receive adequate instruction as to what the true scoring rubric would be; thus, the scores it received were not commensurate with a full opportunity to be heard, as they never received the "factual basis for the action and the opportunity to rebut the evidence supporting that action" which "are essential components of due process." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014). And then, when presented with this evidence, Calmeise ignored the evidence and otherwise stated that she would not consider any arguments pertaining to DDOT's preferential treatment of Bolt. *See supra* pp. 19-20. She

also completely ignored evidence Spin put forth to show the DDOT's erroneous scoring. *See supra* 21-23. Further, throughout the appeal process, Spin repeatedly requested documents and information relevant to its appeal. But DDOT consistently refused to share the requested information, thereby hamstringing Spin's ability to present its case to Calmeise. Ver. Compl. ¶ 119.[3] *See Bird Rides, Inc. v. D.C. Dept of Transp.*, No. 2023-CAB-00316, at p. 10 (D.C. Super. Ct. Sept. 20, 2023) (explaining that DDOT violated the applicant's due process rights in several respects including where DDOT delayed answering questions and providing information, as well as tardy or insufficient FOIA responses); *Greene v. McElroy*, 360 U.S. 474, 496-97 (1959) ("[I]n all types of cases where administrative and regulatory actions [a]re under scrutiny," "the evidence used to prove the Government's case must be disclosed to the [regulated] individual so that he has an opportunity to show that it is untrue.").

And finally, Calmeise denied Spin the ability to have an evidentiary hearing. *See supra* pp. 23-24. This was a patent rejection of directly applicable evidence that went to a deprivation of Spin's constitutional rights, and thus deprived Spin of an opportunity to respond to evidence upon which the DDOT purportedly relied to make its decision to reject Spin's application. *See Bird Rides, Inc.*, No. 2023-CAB-00316, at p. 10 (holding that DDOT Hearing Officer's denial of an evidentiary hearing constituted a violation of the applicant's procedural due process rights). Indeed, it shows that she made her recommendation in a vacuum without provider Spin a full and fair opportunity to present all relevant evidence or even consider Spin's arguments. Furthermore, in her cursory treatment of Spin's arguments evidences a failure of DDOT to adequately explain itself for the denial of Spin's application.

---

[3] And DDOT's response to Spin's FOIA request was woefully insufficient: DDOT withheld much of it as purportedly privileged but without meeting its obligations to provide a log or segregate out non-privilege information—a decision that Spin is separately appealing.

**C.      DDOT violated Spin's equal protection rights.**

Spin is likely to succeed on the merits of its claim that DDOT has violated equal protection under the law. The Fourteenth Amendment's Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Thus, in essence, the Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). The Fourteenth Amendment's equal protection clause applies to the District of Columbia via the Fifth Amendment's due process clause. *Creese v. District of Columbia*, 281 F. Supp. 3d 46, 52 n.2 (D.D.C. 2017) (citing Bolling v. Sharpe, 347 U.S. 497, 499 (1954)).

For the reasons set forth above, these rights were simply not afforded to Spin for a myriad of reasons. For one, all applicants were required to complete an in-person device demonstration on November 4, 2024, and the DDOT made it abundantly clear that no extensions would be provided for this demonstration. And yet, it gave Spin's competitor—Bolt—precisely that, when it allowed Bolt to delay its in-person demonstration eight days after the mandatory deadline. Second, as a condition of the application, all applicants were required to launch operations on a particular date. Similar to the extension for the in-person demonstration, however, Bolt received an additional grace period to launch operations after January 1, 2025. And lastly (and perhaps most egregiously) the DDOT used a different scoring rubric than what was initially published.

As evidenced here, all of these instances of disparate treatment are independent violations of the Equal Protection Clause—and with zero reason for that disparate treatment, given that Spin is a direct competitor to the other applicants and thus on equal ground with each of them. As there is no rational basis for this disparate treatment, the DDOT's actions have run afoul of the Equal

Protection Clause. *See Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008); *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000).

## II.    Spin will suffer irreparable harm in the absence of a TRO.

Defendants' arbitrary and unconstitutional refusal to allow Spin to continue providing best-in-class mobility solutions to District residents and visitors is causing Spin irreparable harm.

The Director's Final Decision provided that Spin must remove all its devices from the public right of way within 72 hours. *See also* 24 DCMR 3318.6. If Spin were to fail to remove its devices within that time, then Defendants could impound Spin's devices and block Spin from obtaining any additional permit for a two-year period. *See id.*, 24 DCMR 3318.7. On March 27, DDOT alerted Spin that it would delay enforcing the 72-hour removal requirement until April 6, "as long as Spin is demonstrating efforts to remove devices" and displaying "downward deployment trends." Ver. Compl. ¶ 84 and Ex. K attached thereto. To that end, Spin must begin removing its fleet imminently, and well prior to April 6, 2025.

In addition to the removal of Spin's e-scooters and bikes from the District and the accompanying lost revenue, Spin has been—and will continue to be—reputationally harmed by Defendants' decision. For example, Spin will lose the good will it has garnered with its customers during the last six years of operations in the District: users will delete the Spin app and this will create barriers to entry for consumers who wish to use Spin in the future. Ver. Compl. ¶ 134. This is paradigmatic irreparable harm. *See Dunkin' Donuts Franchising, LLC v. 14th St. Eatery, Inc.*, 102 F. Supp. 3d 334, 338 (D.D.C. 2015) (holding that loss of control of reputation and diminishment of good will are irreparable harm); *T.I.M.E.-DC, Inc. v. I.A.M. Nat'l Pension Fund*, 597 F. Supp. 256, 264 (D.D.C. 1984) ("The threats of diminished consumer confidence and elimination of business opportunities . . . constitut[e] irreparable harm.").

Moreover, Spin will be forced to lay off numerous salaried employees and will lose its ability to compete in the District's micromobility market. Ver. Compl. ¶ 134. These are cognizable categories of irreparable harm that weigh in favor of a preliminary injunction. *See TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 83-85 (D.D.C. 2020) ("Loss of talent and the inability to recruit and retain employees to build—or even maintain—[a] business constitutes irreparable harm.") (internal quotation marks omitted); *Giri v. Nat'l Bd. of Med. Examiners*, 718 F. Supp. 3d 30, 45 (D.D.C. 2024) ("[L]ost eligibility and opportunity to compete is a[n] . . . irreparable harm in itself.").

In fact, another federal court recently found that Spin would suffer irreparable harm and granted a TRO under remarkably similar circumstances. After several years of Spin successfully operating in the City of Columbus, the City declined to renew Spin's permission to operate. Spin sued, alleging that the City's denial violated applicable law and was causing Spin irreparable harm for the same reasons as the District's decision is here. The Southern District of Ohio agreed. *See* Ex. 1. at p. 18.

## III. Neither Defendants nor the public will be harmed by a TRO.

A TRO will actually benefit the public interest as well as Defendants. For starters, Spin's Low Income Customer Plan provides unlimited free trips to low-income residents. The plan is a resounding success; in fact, 5.78% of all Spin trips are taken by low-income riders. Ver. Compl. ¶ 137. To this end, excluding Spin from the District would have severe consequences in that it would deprive District residents of free transportation—transportation that residents rely upon to commute to work, access necessary goods and services, as well as for leisure.

Further, DDOT's adherence to its own stated requirements maintains the integrity of the permit application process and is in the public interest, because "there is generally no public

interest in the perpetuation of unlawful agency action." *Gomez v. Trump*, 485 F. Supp. 3d 145, 200 (D.D.C. 2020). "To the contrary, there is a substantial public interest in having governmental agencies abide by the . . . laws that govern their existence and operations." *Id.*; *see also Aracely, R v. Nielsen*, 319 F. Supp. 3d 110, 156 (D.D.C. 2018) ("[T]he public interest is served when administrative agencies comply with their obligations . . . .").

Specifically, in granting Spin's request for a TRO, the Southern District of Ohio plainly held that "[t]he public has an interest in publicly available micromobility." Ex. [] at p. []. And even further, the public has an interest in being able to exercise free choice in a competitive market. Defendants' decision to exclude Spin creates a monopoly (or at least a dangerous probability of one) in the District's micromobility market because it necessarily decreases the amount of competitors in the District. In fact, DDOT's decision will result in a single operator being granted **86%** of the shared scooter fleet available in the District, effectively creating a monopoly. Ver. Compl. ¶ 140. This runs counter to the public's interest in free competition. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 372 (1963) ("[C]ompetition is our fundamental national economic policy, offering as it does the only alternative to the cartelization or governmental regimentation of large portions of the economy."); *Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Grp.*, 295 F. Supp. 2d 75, 96 (D.D.C. 2003) ("The public interest is served by ensuring no unreasonable restraints on competition."). Preserving the status quo and allowing Spin to continue its operations in the District will do nothing but serve the public interest by allowing consumers the choice to utilize Spin's services in the market.

## CONCLUSION

The Court should grant Plaintiff's Application for a temporary restraining order and preliminary injunction preventing Defendants from (i) enforcing 24 DCMR 3318.6, 24 DCMR

3318.7, or any other consequence against Spin for failing to remove or disable its devices from

or in public rights-of-way during the pendency of this litigation and (ii) excluding Spin from

operating in the District during the pendency of this litigation.

Respectfully submitted,

HUSCH BLACKWELL LLP

*/s/ Hal J. Perloff*
Hal J. Perloff (DC Bar #461716)
1801 Pennsylvania Avenue, NW, Suite 1000
Washington, DC 20006-3606
Telephone: (202) 378-2354
Facsimile: (202) 378-2319
hal.perloff@huschblackwell.com

and

Michael Klebanov (*admission forthcoming*)
1801 Pennsylvania Ave., NW, Suite 1000
Washington, D.C. 20006-3606
Telephone: (202) 378-2363
Facsimile: (202) 378-2319
michael.klebanov@huschblackwell.com