## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PHEENIX USH LLC**<br>**D/B/A SPIN** ) | |
| ) | |
| ) | |
| Plaintiff, ) | Case No. 1:25-cv-00922 |
| v. ) | |
| ) | |
| **DISTRICT DEPARTMENT OF** ) | |
| **TRANSPORTATION**, *et al.,* ) | **REPLY IN SUPPORT OF MOTION** |
| ) | **FOR PRELIMINARY INJUNCTION** |
| Defendants. ) | |

### INTRODUCTION

DDOT does not contest that exclusion of Spin from the District's micromobility market will be detrimental to low-income residents who rely on Spin's Low Income Customer Plan, which provides them with unlimited free trips. Nor does DDOT contest that Spin's exclusion will produce a monopoly, with one operator clutching 86% of the e-scooter market. Both of these will adversely impact the public interest. And DDOT's vague gestures to "uncertainty" or other litigation all are based on a false premise that Spin's inclusion in the District requires removing another operator. Quite the opposite—Spin seeks a preliminary injunction to *maintain* the status quo.

What's more, Spin will be forced to lay off all of its employees in the District—dozens of District residents. And Spin will permanently forfeit customer good will and market presence. Experience in other markets bears this out. The District is Spin's most important market and exclusion from the District will be an existential threat to Spin. The D.C. Circuit recognizes these are all irreparable injuries.

If the Court grants Spin's Motion, each of these harms will be totally avoided, and at no cost to Defendants. While the balance of harms in this case is alone sufficient to warrant injunctive

relief, such relief is all the more warranted in light of the strength of Spin's arguments on the merits. Spin has far exceeded the requirement of raising "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Booth v. Bowser*, 597 F. Supp. 3d 1, 16 (D.D.C. 2022). And Spin is likely to prevail on the merits of its claims, all of which the Court has jurisdiction over.

The Court should grant Spin's motion.

## ARGUMENT

### I.    Spin will suffer irreparable harm in the absence of a preliminary injunction.

In its Verified Complaint, Spin alleged several cognizable categories of irreparable harm that will occur if it is excluded from the District, including damage to customer good will, loss of talent due to mass layoffs of employees, and inability to compete in the District's micromobility market. And much of that harm to Spin would be permanent. *See infra* & Lankford Decl. ¶ 14 (included as Exhibit 1). Despite this, DDOT argues that Spin's alleged injuries are insufficient to constitute irreparable harm because "[t]here is no reason to suspect . . . that Plaintiff's international enterprise will be threatened if it ceases operations in the District." Opp'n at 1, 5. But this mischaracterizes the governing law and is not the standard to illustrate irreparable harm. Nor does it comport with the facts.

At the outset, as DDOT concedes, financial harm can constitute irreparable harm "where no adequate compensatory or other corrective relief will be available at a later date." *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1329 (D.C. Cir. 2024) (internal citations omitted); Opp'n at 4-5. Here, Spin's damages are not adequately remedied by compensatory or other corrective relief because Spin's claims, which sound in equity, preclude monetary damages. *See, e.g.*, *Dickey-John Corp. v. Bergland*, 444 F. Supp. 451, 455 (D.D.C. 1978) (disappointed

potential bidder could not recover lost profits, but would be limited to recovery of bid preparation costs). Nor does DDOT cite any authority that suggests the harm to Spin could be remedied with monetary relief. *Cf. Nelson v. Natl. Aeronautics and Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds* 562 U.S. 134 (2011) ("constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm.").

Further, DDOT artificially inflates the legal standard by arguing that Spin must be bankrupted or forced to shut down its "international enterprise" to adequately allege irreparable harm. Opp'n at 4-5. To the contrary: all a plaintiff must show is that the absence of an injunction would lead to a business's "destruction in its current form." *Alpine Sec. Corp.*, 121 F.4th at 1329 (quoting *Wash. Metro. Area. Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)) (holding that an injunction refraining defendant from operating a motor coach service in the District would be "its destruction in its current form as a provider of bus tours"). Spin's exclusion from the market will certainly result in the business's "destruction in its current form," as it would no longer be able to offer its e-scooter and e-bike services in the District. *Id.* In any event, even if the Court chose to follow DDOT to unchartered legal standards, Spin has met that standard: the District is by far Spin's most important market by all relevant factors, and expulsion from the District would threaten Spin's very existence. Lankford Decl. ¶¶ 17-18.

DDOT's Opposition then quibbles regarding Spin's "economic-adjacent" harms. Opp'n at 5-8. In doing so, DDOT scours the cases cited in Spin's Motion (which Spin cited for settled legal principles) to stress irrelevant factual differences. *See* Opp'n at 6-7.[1] But, at bottom, two things

---

[1] For example, that *TikTok* involved a nationwide ban does not diminish the applicability of the court's holding that being "unable to recruit and retain employees" is "irreparable harm." 490 F. Supp. 3d at 84. The District forcing out Spin will create exactly that irreparable harm to Spin. Lankford Decl. ¶¶ 19-24.

remain true: (i) Spin has alleged cognizable categories of irreparable harm under governing law and (ii) Spin has alleged adequate facts to show that it will suffer permanent and irremediable harm if it is excluded from the District. *See* Mot. for TRO at 29-30.

First, DDOT argues that laying off employees does not constitute irreparable harm. Opp'n at 7. DDOT supports this proposition by citing a single case from the Northern District of California that stands in direct conflict with D.C. law, which plainly states that "[l]oss of talent . . . constitute[s] irreparable harm." *Xiaomi Corp. v. Dep't of Defense*, 2021 WL 950144, at *12 (D.D.C. Mar. 12, 2021) (quoting *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 83-85 (D.D.C. 2020)). So, to allege that loss of talent constitutes irreparable harm, Spin must show that injury is "certain and great, and actual and not theoretical." *Citizens for Responsibility & Ethics in Washington v. FEC*, 904 F.3d 1014, 1019 (D.C. Cir. 2018). Spin meets this standard—it will be forced to lay off its *entire* workforce if it is prohibited from operating in the District. Lankford Decl. ¶ 19. This workforce includes District residents in whom Spin heavily invested with training and recruiting, with talents that are rare. *Id.* ¶¶ 20-21. This injury is neither insignificant nor speculative.

Second, contrary to DDOT's guessing, the facts show Spin will suffer permanent reputational harm if it is excluded from the District. If Spin is prohibited from operating in the District, Spin's existing customers will—correctly—consider Spin to be out of business in the District. Lankford Decl. ¶ 12. They will delete the Spin app from their phones and quickly download another providers' app. *See T.I.M.E.-DC, Inc. v. I.A.M. Nat'l Pension Fund*, 597 F. Supp. 256, 264 (D.D.C. 1984) ("The threats of diminished consumer confidence and elimination of business opportunities . . . constitut[e] irreparable harm."). Because of this, the vast majority of customers will never come back *even if* Spin re-enters the District market in the future. Lankford Decl. ¶ 14. Even further, market research and analysis indicate that if Spin is forced out of the

District, Lime will likely have a near monopoly of the District micromobility market, with 86% of the e-scooter fleet share, by the end of the 2025-2026 cycle. *Id.* ¶ 15. This monopoly will make it exceedingly difficult, if not impossible, for Spin to regain market shares and customers. *Id.* ¶ 14. Experience in other markets, such as Denver, is proof of these facts and the irreparable harm. *Id.*

## II.     The public will benefit from a preliminary injunction: absent an injunction low-income District residents suffer and District residents are left to the whims of a monopoly.

DDOT fails to address and thus concedes that the public would benefit from a preliminary injunction in a few ways. *First*, DDOT's decision to exclude Spin will create a monopoly in the District's micromobility market: one operator will have at least 86% of the shared scooter fleet available, effectively creating a monopoly. Mot. for TRO at 31; Ver. Compl. ¶ 140. Allowing consumers the choice to utilize Spin's services and avoid a monopoly does nothing but serve the public interest. Mot. for TRO at 31.

*Second*, many low-income residents in the District currently rely on Spin's Low Income Customer Plan, which provides unlimited free trips to low-income residents, including for commuting to work. *Id.* at 30; Ver. Compl. ¶ 137. DDOT's decision would have severe consequences for those District residents. Mot. for TRO at 30.

*Third*, it is undisputed that it is always in the public interest for an administrative agency to act fairly and lawfully. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 200 (D.D.C. 2020) ("[T]here is a substantial public interest in having governmental agencies abide by the . . . laws that govern their existence and operations."); *Aracely, R v. Nielsen*, 319 F. Supp. 3d 110, 156 (D.D.C. 2018) ("[T]he public interest is served when administrative agencies comply with their obligations . . . .").

DDOT's response instead rests on a false premise: that if Spin remains in the District, somehow another operator's permit will be taken away. There are no facts or regulations to suggest DDOT must or would revoke another business's permit to satisfy Spin's request for relief. Lankford Decl. ¶ 25. Instead, the laws of the District of Columbia contemplate up to *five* electric micromobility operators. D.C. Code Ann. § 50-2201.03c(b)(3)(B); 24 DCMR 3314.24. Affording Spin its relief will still leave the District under this cap. The District, in other words, has *already decided* it is in the public's interest to have up to five electric micromobility operators.

Proceeding from this false premise, DDOT speculates that injunctive relief would injure other operators, invite additional litigation, and create additional uncertainty. Opp'n at 17. But DDOT fails to point to any *claim* a party could make if Spin is awarded relief here. In fact, no facts suggest any another operator would lose a permit, be faced with uncertainty, or seek to litigate. Lankford Decl. ¶ 26.[2]

Much as DDOT's position rests on a false premise, its cases are all inapt. In fact, *Cent. & S. Motor Freight Tariff Ass'n., Inc. v. United States* undercuts DDOT's position. 757 F.2d 301 (D.C. Cir. 1985). The D.C. Circuit was clear that the complaining party could still compete in that same market. *Id.* at 324 ("[B]ecause common carriers may choose to acquire contract authority under the newly liberalized entry standards and serve *the very same trade* they had previously served . . . ." (emphasis in original).) Here, there is no dispute that absent relief, Spin would be

---

[2] If DDOT's point is merely that the monopolist operator will lose riders following a Court order, that is false because Spin is *currently* operating in the District and only seeks to maintain the status quo. Either way, the public interest in avoiding a monopoly is greater than the public interest in one monopolist garnering greater revenue. *See Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Grp., Inc.,* 295 F. Supp. 2d 75, 96 (D.D.C. 2003) ("The public interest is served by ensuring no unreasonable restraints on competition."); *Collins Inkjet Corp. v. Eastman Kodak Co.,* 781 F.3d 264, 280 (6th Cir. 2015) (holding that the public interest is served by injunctions with a pro-competitive effect).

entirely excluded from the District. DDOT's other cases are no better. The plaintiff, a bidder for a government contract, in *Eco Tour Adventures, Inc. v. Zinke* asked that the contracts "be rescinded in their entirety." 249 F. Supp. 3d 360, 391-92 (D.D.C. 2017). Spin is not asking this Court to rescind any permits, and permit applicants are not vying for a single contract. So too for *Am. Fuel & Petrochemical Manufacturers v. Envt' Protec. Agency*, 3 F.4th 373, 379 (D.C. Cir. 2021). There, companies impacted by the EPA's lifting of restrictions on the sale of ethanol had competitor standing to sue the EPA because the agency's decision *increased* competition. And that harm could be "redressed by restoring the regulatory *status quo ante*." *Id*. Here, DDOT's decision seeks to *decrease* competition. A court order for DDOT to maintain the *status quo ante* would not confer standing on other operators to sue because it (i) it is an order from this Court, not a decision by the agency, and (ii) it merely preserves the *status quo ante* with no change to the current competitive marketplace in the District.

The public interest will be served by preventing a monopoly in the District, maintaining residents' access to Spin's Low Income Customer Plan, and ensuring that DDOT acts fairly and lawfully.

**III.     Spin is likely to prevail on the merits of its claims, and at least has raised serious questions going to the merits.**

To satisfy the likelihood of success on the merits factor, a plaintiff needs only to "raise[] questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation"—especially when, as here, the other factors supporting injunctive relief weigh overwhelmingly in the plaintiff's favor. *Booth v. Bowser*, 597 F. Supp. 3d 1, 16 (D.D.C. 2022) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977); *Confederated Tribes of Chehalis Rsrv.*

*v. Mnuchin*, No. 20-CV-01002 (APM), 2020 WL 3791874, at *1 (D.D.C. July 7, 2020); *Liuksila v. Turner*, No. 16-CV-00229 (APM), 2018 WL 6621339, at *1 (D.D.C. Dec. 18, 2018).

### A. The Court can—and should—exercise supplemental jurisdiction over Spin's judicial review claim.

The Court both can and should exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) to decide Spin's D.C.-law claim for judicial review of the DDOT's decision.

To begin, the Supreme Court has held that federal courts can exercise supplemental jurisdiction over state-law claims for judicial review of state administrative agency action. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165–66, 174 (1997) (holding that federal district court could "exercise supplemental jurisdiction over ICS' state law claims, including the claims for on-the-record administrative review of the Landmarks Commission's decisions").

Consistent with the Supreme Court's holding in *City of Chicago*, this Court has on multiple occasions exercised supplemental jurisdiction to decide D.C.-law claims for judicial review of D.C. agency action. *See, e.g.*, *Greenlee v. Bd. of Med. of D.C.*, 813 F. Supp. 48 (D.D.C. 1993); *Spivey v. Barry*, 501 F. Supp. 1093 (D.D.C. 1980), *rev'd on other grounds*, 665 F.2d 1222 (D.C. Cir. 1981); *see also Kingman Park Civic Assn. v. Gray*, 27 F. Supp. 3d 171, 178 (D.D.C. 2014), *aff'd sub nom. Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36 (D.C. Cir. 2016) (*Kingman II*). In *Greenlee*, for example, a physician applying for a license to practice in D.C. challenged the denial of his application by the District of Columbia Board of Medicine under both state and federal law. *Greenlee*, 813 F. Supp. at 58. This Court exercised jurisdiction over the pendent D.C.-law claim arguing that the Board exceeded its authority and acted arbitrarily and capriciously. *Id.* And in *Spivey*, this Court reviewed a decision by the D.C. government to close a health clinic without evaluating the effect on the medically indigent and decided that that action was arbitrary and capricious. *Spivey*, 501 F. Supp. at 1105–06.

In sum, this Court can exercise—and has exercised—supplemental jurisdiction over D.C.-law claims for judicial review of D.C. administrative agency action.

To be sure, a few of this Court's decisions contain language suggesting that this Court cannot so exercise supplemental jurisdiction. These decisions, however, are inapplicable to this case. A closer look shows why.

Consider *Lightfoot v. District of Columbia*, 448 F.3d 392 (D.C. Cir. 2006). There, the Court declined to exercise supplemental jurisdiction over a D.C.-law claim for judicial review of D.C. administrative agency action. *Id.* at 399. But that claim—unlike the claim here—was brought under the D.C. Administrative Procedure Act, which endows the D.C. Court of Appeals with "exclusive jurisdiction" over claims that fall within its reach. *District of Columbia, Dept. of Public Works v. L.G. Indus., Inc.*, 758 A.2d 950, 954 (D.C. 2000); *see* D.C. Code § 2-510. Indeed, when this Court has declined to exercise supplemental jurisdiction over a D.C.-law judicial review claim, that claim has arisen under the D.C. Administrative Procedure Act. *See, e.g.*, *States v. District of Columbia*, No. CV 18-1652 (ABJ), 2019 WL 295472, at *7 (D.D.C. Jan. 23, 2019); *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 161–62 (D.D.C. 2014) (*Kingman I*) (regarding claim subject to D.C. Administrative Procedure Act).

*This* case *does not* arise under the D.C. Administrative Procedure Act. Whereas that Act governs only "contested" administrative cases, this is not such a "contested" case. Opp'n at 17; Ver. Compl. pp. 12-15; *Bird Rides, Inc. v. D.C. Dep't of Transp.*, No. 2023-CAB-00316, at p. 11 (D.C. Super. Ct. Sept. 20, 2023).; *R.O. v. Dep't of Youth Rehab. Servs.*, 199 A.3d 1160, 1165 (D.C. 2019). Because the D.C. Administrative Procedure Act does not apply, the D.C. Court of Appeals does not have "exclusive jurisdiction"—and thus the principal animating concern in cases like

*Lightfoot* is not implicated here.[3] In fact, the D.C.-law judicial-review claim here does not arise under any D.C. statute at all. It is instead a form of equitable action, thus easily susceptible to federal district court handling. *See Capitol Hill Restoration Soc'y, Inc. v. Moore*, 410 A.2d 184, 188 (D.C. 1979) (referring to non-statutory review like that here as an "equitable action"); *Columbia Realty Venture v. D.C. Hous. Rent Comm'n*, 350 A.2d 120, 123–24 (D.C. App. 1975) ("[T]he ability of the courts to use their equity power to review administrative decisions is founded on the constitutional basis of the due process clause. If an agency acts without the authorization of law or in contravention of law, it deprives the party whose conduct is being regulated of his property without due process of law. It is a function of the courts to see that the Constitution is being followed and if a court determines that an agency through its improper action is depriving a person of his property without due process of law, then it is incumbent upon that court to correct the improper action through the use of the equity power."). Spin is not aware of, and DDOT has not pointed to, any case that *does not* arise under the D.C. Administrative Procedure Act, like the one before it now, where the Court has refused to exercise supplemental jurisdiction.

Finally, not only *can* the Court exercise supplemental jurisdiction—it *should*.

The Court's exercise of supplemental jurisdiction is discretionary. The factors that guide this Court's discretion over supplemental jurisdiction are whether (1) the claim raises a novel or complex issue of state law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, and (4) in exceptional circumstances, there are other compelling

---

[3] Even in D.C. Administrative Procedure Act cases, moreover, this Court has made clear that *Lightfoot* "by no means bar[s]" this Court "from exercising supplemental jurisdiction over a District of Columbia administrative decision." *Kingman II*, 27 F. Supp. 3d at 178. And in all events, "procedural rules of the local District of Columbia courts have no impact on this federal Court's jurisdiction." *Kingman II*, 27 F. Supp. 3d at 178.

reasons for declining jurisdiction. 28 U.S.C. § 1367(c). When deciding whether to exercise jurisdiction, the Court will consider judicial economy, convenience, and fairness to litigants. *Women Prisoners of D.C. Dept. of Corrections v. D.C.*, 93 F.3d 910, 920 (D.C. Cir. 1996) (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)).

When there is overlap in the analysis of state and federal claims, judicial economy and convenience weigh in favor of exercising supplemental jurisdiction. *Bushrod v. D.C.*, 521 F. Supp. 3d 1, 11 n.2 (D.D.C. 2021) (exercising jurisdiction over D.C. common law claims of assault and battery after granting summary judgment on the 42 U.S.C. § 1983 claim).

Here, the analysis of the D.C. claim is linked factually and analytically to the federal claims. Spin's claim for judicial review does not raise a novel or complex issue of local law, nor does the claim predominate over the federal claims. In fact, DDOT has not even tried to assert these arguments. Judicial economy, convenience, and fairness weigh in favor of the Court exercising supplemental jurisdiction.

The Court can, and should, exercise supplemental jurisdiction over Spin's state law claims because the state and federal claims derive from a common nucleus of operative fact, and it is in the interest of judicial economy, convenience, and fairness to hear the claims together. While some authority suggests there is a preference for the Court to decline to exercise supplemental jurisdiction over local agency actions, this is a non-contested matter, and jurisdiction is not statutorily committed to the local courts, unlike in *Lightfoot* and *Kingman I*.

**B.    Spin is likely to prevail on its judicial review claim because DDOT's decision to deny Spin a permit was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.**

As Spin explained, DDOT acted arbitrarily and capriciously in five different ways. *See* Mot. for TRO at 10-25. DDOT's meager response concedes most of Spin's points and otherwise

fails to persuade. Spin has clearly "raise[d] questions going to the merits so serious, substantial, difficult and doubtful" to satisfy the likelihood of success on the merits factor for a preliminary injunction. *Booth v. Bowser*, 597 F. Supp. 3d 1, 16 (D.D.C. 2022) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)).

*First*, DDOT does not contest that it granted preferential treatment to Bolt, thereby failing to "follow its own rules, procedures, and policies." *Wilmina Shipping AS v. United States Dep't of Homeland Sec.*, 75 F. Supp. 3d 163, 173 (D.D.C. 2014), and "fail[ing] to treat similar cases in a similar manner," *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 78-9 (D.D.C. 2015). In particular, DDOT treated Bolt preferentially in two ways. *See* Mot. for TRO at 12-14. One, DDOT let Bolt have a private in-person demonstration after the mandatory deadline. The Permit Application Instructions stated that an in-person demonstration was "*required* for all applicants *on 11/4/2024*." Ver. Compl. ¶ 31 and Ex. A attached thereto (emphases added). And the Instructions stated that "[a]pplications that are missing required elements *will not* be evaluated and scored." *Id.* (emphasis added). Two, DDOT allowed Bolt to delay its launch of operations in the District, in direct contravention of the Permit Operator Agreement. Ver. Compl. ¶¶ 34-35 and Exhibit C attached thereto.

*Second*, Spin explained that DDOT used a secret, unpublished scoring criteria to evaluate permit applications. Mot. for TRO at 14–19. Other than parrot a single conclusory sentence from the Hearing Officer's recommendation, DDOT does not dispute that it used an unpublished set of criteria, that the unpublished criteria were secret, or that the secret criteria were materially different from the published criteria. In short, DDOT admits that it "ignore[d] . . . its own criteria," *Doe v. Mamsi Life and Health Ins. Co.*, 471 F. Supp. 2d 139, 148 (D.D.C. 2007), "applied an incorrect legal standard," *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 109 (D.D.C. 2018), and

"relied on factors" it was "not intended it to consider," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Pheenix USH LLC v. City of Columbus*, No. 2:24CV04290, ECF 16, at p. 15 (Dec. 31, 2024), attached to TRO Mot. as Exhibit 1 (granting Spin's motion for TRO and explaining that denying permission to operate "based on unannounced criteria may be arbitrary enough to constitute an abuse of discretion").

DDOT's only response is to say that its admitted error does not matter. Using the secret rubric was not arbitrary and capricious, DDOT says, because it applied the secret criteria equally to all applicants. Opp'n at 14–15. But DDOT cannot cure its "appli[cation of] an incorrect legal standard," *Zinke*, 289 F. Supp. 3d at 109, by applying an incorrect standard against everyone. Multiplying a wrong does not make it a right.

The only case DDOT cites actually underscores *Spin's* point. As DDOT recites, "[a]n agency must be allowed to adjust its policies to changing circumstances, within the framework of rules it established in advance." Opp'n at 14–15 (quoting *U.S. AirWaves, Inc. v. F.C.C.*, 232 F.3d 227, 235 (D.C. Cir. 2000)). The key, of course, is that an agency act "within the framework of rules it established in advance." DDOT's game-time decision to score applications based on an unpublished, secret criteria is the opposite of that.

*Third*, DDOT does not dispute that Calmeise acted arbitrarily and capriciously and committed an error of law when she improperly ignored several of Spin's appeal arguments as "outside of her review authority." *See* Mot. for TRO at pp. 19-21. Particularly, Calmeise failed to consider DDOT's preferential treatment of Bolt and its impact on Spin's scores and the permit application process as a whole. As Spin explained, Calmeise's authority did extend to these issues. Mot. for TRO at 20. DDOT offers no response.

*Fourth*, DDOT does not meaningfully dispute that Calmeise acted arbitrarily and capriciously when she ignored evidence in Spin's Amended Appeals regarding improper scoring. *See* Mot. for TRO at 21-23. Calmeise concluded—in two short paragraphs—that DDOT applied the proper scoring criteria and scored Spin's applications correctly. Calmeise did not explain her reasoning at all; rather, she stated that Spin's position "does not support the overall intention to provide exemplary services to the district." Ver. Compl. ¶ 80 and Exs. H and I attached thereto at p. 7. This is not "reasoned decisionmaking" necessary to support an agency determination. *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14, 24 (D.D.C. 2014) (reversing agency action where the proffered explanation "contain[ed] very little reasoning or analysis" and thus failed to "articulate a satisfactory explanation" (cleaned up)); *cf. Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1363 (Fed. Cir. 2023) ("We agree that Commerce's explanation was insufficient. We are unable to conclude that Commerce even considered AGIS's argument, and Commerce's discussion is limited to a single paragraph that is vague and conclusory and wholly fails to explain why Commerce believed that using AGIS's dataset would be improper.").

*Fifth*, DDOT does not contest that Calmeise's denial of an evidentiary hearing was arbitrary and capricious. An agency that denies due process rights is arbitrary and capricious. *See Del Laby's, Inc. v. United States*, 86 F.R.D. 676, 681 (D.D.C. 1980) (holding that agency action that denied due process was arbitrary and capricious). *See infra* Section III.C.

Instead of disputing *any* of the above arguments, DDOT nitpicks *Phoenix USH LLC v. City of Columbus*, a recent Southern District of Ohio decision also featuring a local government's denial of Spin's ability to continue to operate in a jurisdiction it had a long-term presence in. No. 2:24CV04290, ECF 16 (S.D. Ohio Dec. 31, 2024). Any minor differences between that case and this one are far outweighed by the overwhelming similarities. Both cases feature a local

government that applied unannounced criteria to evaluate applications for permission to operate micromobility vehicles. *See id.* at 15 (granting Spin's motion for TRO and explaining that "[r]ejecting a bid based on unannounced criteria may be arbitrary enough to constitute an abuse of discretion"). Both cases involve government decisionmaking reviewed under the arbitrary-and-capricious standard. *See id.* And in both cases, damages were not an available, adequate remedy, meaning harm was irreparable. *See id.* at 19–20; *see supra* at 2-3. DDOT's hypertechnical point that *Columbus* relied on competitive-bidding laws is both irrelevant (because the standard of review is the same regardless) and hypocritical.[4]

### C.    DDOT violated Spin's due process rights.

Spin's protected due process interests are at stake and DDOT deprived Spin of due process.

#### 1.    Contrary to DDOT's assertion otherwise, Spin has a liberty interest and a property interest that warrant due process protection.

Spin has a protected liberty interest. As an initial matter, DDOT mischaracterizes the nature of the relationship between Spin and the government. Spin is *not* seeking to "do business with the government," as was the situation in *Gonzales v. Freeman*, 334 F.2d 570 (D.C. Cir. 1964), where a private entity had a contractual relationship with the government. Therefore, *Gonzales*, which DDOT relies on, does not apply here. Rather, Spin is seeking permission from DDOT to engage in its chosen profession and trade in the District,[5] not unlike an attorney trying to seek the DC bar association's permission to practice law in DC. Courts have long recognized the liberty interest of

---

[4] DDOT distinguishes *Columbus* because it deals with competitive bidding laws—which are apparently not at all relevant to this case—while simultaneously referring to Spin as a "disappointed bidder for a license to operate . . . in the District." Opp'n at 1. In fact, DDOT cites several "disappointed bidder" cases throughout its Opposition. *See id.* at 10, 13. DDOT cannot have its cake and eat it too.

[5] Indeed, DDOT issued a "Permit Application Instructions" to Spin and competitors for the application process, which further shows that the nature of the relationship here is license-seeking rather than contractual. *See* Ex. A to Compl.

businesses—like Spin—in seeking professional licensure and permits. *See, e.g.*, *Greene v. McElroy*, 360 U.S. 474, 492 (1959) ("[T]he right … to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty and 'property' concepts of the Fifth Amendment."); *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) (same); *Woods v. D.C. Nurses' Examining Bd.*, 436 A.2d 369, 372-73 (D.C. 1981) ("The right to practice one's chosen profession is a liberty interest for purposes of the due process clause."); *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992) (finding that "the liberty to follow a trade, profession, or other calling" is a liberty interested protected by the due process clause); *Raffensperger v. Jackson*, 316 Ga. 383, 388 (2023) (holding that due process protects "occupational licensing and the ability to pursue a lawful occupation.").

DDOT next argues that Spin lacks a protected interest because it is not debarred from doing business in the District permanently. Opp'n at 9. This argument also lacks merit. The temporal duration of the prohibition is irrelevant—indeed, the government can lift a debarment or extend a short-term bar. *See, e.g.*, *Horne Bros., Inc. v. Laird*, 463 F.2d 1268, 1271 (D.C. Cir. 1972) (debarments can be lifted); *Friedler v. Gen. Servs. Admin.*, 271 F. Supp. 3d 40, 45 (D.D.C. 2017) (terms of debarments can be extended). Spin has a protected liberty interest in pursuing its chosen trade in the District, regardless of whether DDOT bars Spin from DC forever or for 2 years.

Spin also has a protected property interest in its previously held permit to continue operations in the District. *See Bird Rides, Inc. v. D.C. Dept. of Transp.*, No. 2023-CAB-00316, at p. 9-10 (D.C. Super. Ct. Sept. 20, 2023) (holding that the permit applicant/operator has a due process property interest in the permit application from DDOT because the operator submitted the new application before the old one expired). Indeed, the D.C. Circuit has held that a litigant has a property interest in a permit, and it warrants procedural due process protection. *3883 Conn. LLC*

*v. District of Columbia*, 357 U.S. App. D.C. 396, 402, 336 F.3d 1068, 1074 (2003) (finding that the holder of a preliminary permit had a substantial property interest in its continued effect to afford due process protections).

Here, like in *3883 Conn*, Spin was operating in the District under an initial permit which was set to expire on December 31, 2024. Spin submitted its Permit application, and DDOT denied the same, before its initial permit expired. Furthermore, Spin's application answers for the 2025-2026 cycle were just as good if not better than those from the last application cycle, and the number of permits DDOT can grant has not changed. Therefore, Spin had more than a "unilateral expectation" that it could continue operating its business under a permit in the District, as it had been doing since 2019. *See Bird*, No. 2023-CAB-00316, at p. 10. Spin has thus asserted a significant property interest in the Permit to warrant due process protection.

**2. DDOT violated Spin's due process rights, and DDOT fails to meaningfully address Spin's arguments regarding DDOT's due process deficiencies.**

DDOT fails to explain how its treatment of Spin complied with due process in a few ways. *First*, DDOT fails to explain how it complied with due process when it denied Spin access to adequate instructions as to what the true scoring rubric would be. As *Ralls Corp. v. Comm. on Foreign Inv. in U.S.* makes clear, by doing so DDOT denied Spin a full opportunity to be heard because Spin never received the "factual basis for the action and the opportunity to rebut the evidence supporting that action," which "are essential components of due process." 758 F.3d 296, 318 (D.C. Cir. 2014); *see also Trinka v. McDonough*, No. CV 21-2904 (RC), 2023 WL 6160053, at *11 (D.D.C. Sept. 21, 2023) (concluding that the government violated the "touchstone of due process" when it failed to provide access to relevant evidence); *Bird*, No. 2023-CAB-00316, at p.

10 (holding that DDOT violate the applicant's due process rights when it delayed answering questions and providing information).

*Second*, DDOT fails to explain how it complied with due process when it denied Spin access to requested documents and information via Spin's FOIA requests relevant to its appeal. Nearly four months after Spin's FOIA request, and *after* the deadline for Spin's final appeal to Calmeise, DDOT told Spin that it would not produce hundreds of pages of documents. *See* Ex. 2 (FOIA response letter). And DDOT did so with a conclusory claim that the pages were protected. *Id.* DDOT failed to fulfill its obligation to provide a privilege log (known as the *Vaughn* index) segregating out protected versus unprotected information. *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973) ("[I]t is vital that the agency specify in detail which portions of the document are disclosable and which are allegedly exempt. This could be achieved by formulating a system of itemizing and indexing that would correlate statements made in the Government's refusal justification with the actual portions of the document."); *see also Vining v. Council of D.C.*, 140 A.3d 439, 441 n.2 (D.C. 2016); *Kane v. D.C.*, 180 A.3d 1073, 1076-77 n.4 (D.C. 2018). This alone constitutes a due process violation. *See Greene v. McElroy*, 360 U.S. 474, 496-97 (1959) ("[I]n all types of cases where administrative and regulatory actions [a]re under scrutiny," "the evidence used to prove the Government's case must be disclosed to the [regulated] individual so that he has an opportunity to show that it is untrue."); *Bird*, No. 2023-CAB-00316, at p. 10 (D.C. Super. Ct. Sept. 20, 2023) (holding that DDOT violated due process by providing tardy or insufficient FOIA responses).

*Third*, DDOT fails to explain how they complied with due process without granting Spin an evidentiary hearing, when a court previously found DDOT violated an applicant's due process rights by doing the same thing under remarkably similar circumstances. *See Bird*, No. 2023-CAB-

00316, at p. 10 (holding that DDOT Hearing Officer's denial of an evidentiary hearing constituted a violation of the applicant's procedural due process rights). DDOT attempts to muddy the waters by changing the question to "is an evidentiary hearing always constitutionally required." *See* Opp'n at 10-11. The real question is whether the Constitution requires an evidentiary hearing *in this particular situation*. And the answer from courts has been *yes*. *See Bird*, No. 2023-CAB-00316, at p. 10

DDOT's remaining arguments fare no better. DDOT misses the mark in suggesting that Spin's due process claim fails merely because it could be brought in Superior Court. Contrary to DDOT's suggestion, *see* Opp. at 13 the DCAPA does not dictate a process for contesting this DDOT decision. *See supra* Section III.A. So too, DDOT's cases are inapt: both relied on the claimants' ability to seek review under the DC Administrative Procedure Act, *Chavis v. Garrett*, 419 F. Supp. 3d 24 (D.D.C. 2019) and *Medina v. District of Columbia*, 517 F. Supp. 2d 272 (D.D.C. 2007).

Finally, DDOT abandons Calmeise's only reason for refusing to consider DDOT's preferential treatment and violation of its guidance: that somehow Bolt was not an "applicant" under the D.C. Code. Instead, DDOT invents a new reason that Calmeise could refuse to consider DDOT's preferential treatment of Bolt: it was a "deliberate" choice rather than a "mistake," and Spin never alleged otherwise. DDOT ignores the pleadings and facts. Spin alleged that its complaint about Bolt concerned "a mistake in analyzing or calculating an applicant's final score." Ver. Compl. ¶ 78. The facts bear this out. No doubt DDOT made a mistake in calculating DDOT's score: it was a *mistake* for DDOT to calculate Bolt's score at all, because the application should have been disqualified under DDOT's own published guidance. *See supra* Section III.B. *Id.* Also, pause to appreciate DDOT's position: the Hearing Officer could not consider the issue because

19

DDOT *intentionally* violated its own rules and guidance to give preferential treatment to a winning applicant. That same Hearing Officer, acting as DDOT's FOIA officer, failed to provide Spin with a legally adequate FOIA response—critical documents which would shed light on DDOT's *intentional* violation of DDOT's rules and guidance. And that same Hearing Officer, in addition to her cursory treatment of Spin's arguments, refused Spin's request for an evidentiary hearing. DDOT violated Spin's due process rights.

### D.    DDOT violated Spin's equal protection rights when it violated its rules to afford preferential treatment to only one applicant.

The fact remains that DDOT secretly provided preferential treatment to one of the applicants, Bolt, who was otherwise similarly situated to Spin, and DDOT did so without any rational basis.

In response, DDOT denies that "[f]ailure to complete the in person demonstration on November 4 would result in disqualification of an applicant's score." Opp'n. at 12 (citing Compl. at ¶¶ 31). This plainly contradicts DDOT's own published rules. According to DDOT's Permit Application Instructions, the demonstration "is *required* for all applicants on 11/04/24." Ex. A to Compl. at p. 4 (emphasis added). The Instructions further make clear that "Applicants that are missing *required* elements will not be evaluated and scored." *Id.* (emphasis added). Based on DDOT's own published rules, Bolt was missing a required element—the demonstration—as of the deadline. Accordingly, Bolt should have been removed from evaluation and scoring, *i.e.*, disqualified.

DDOT then argues that Bolt was differently situated because Bolt asked for an extension and no other applicants did. Opp'n. at 12. Thanks to DDOT's secret preferential treatment, the other applicants, including Spin, never knew that departing from DDOT's published rules was an option. So, of course no one else sought to ask DDOT to violate its own rules. In other words, Bolt

was differently situated only because *DDOT made Bolt different* by giving Bolt preferential treatment. Furthermore, if DDOT truly had a rational basis for the disparate treatment of applicants, why did DDOT try so hard to hide it from all remaining applicants? DDOT provides no insight in its Opposition on DDOT's selective secrecy.

Finally, DDOT argues that preferential treatment is sometimes allowed. Opp'n at 12-13. But DDOT's cases do not support them. For example, DDOT's reliance on *Willie McCormick & Assocs., Inc. v. City of Detroit* is misplaced. 61 F. App'x 953 (6th Cir. 2003). In *Willie McCormick*, the plaintiff alleged an equal protection violation due to race discrimination. *Id.* at 957. The court held that the plaintiff failed to introduce any evidence that suggests discrimination, but the court never announced a general statement endorsing preferential treatment. *See id.* at 957-58. Nor does the *3883 Conn.* help DDOT. 336 F.3d at 1075. That case involved local opposition to one of the candidates. *Id.* In contrast, here, the record does not indicate the existence of any public opinion towards any applicant, nor has DDOT alleged any local opposition or favoritism towards any of the applicants. And DDOT relies on *Orange Park Fla. T.V. Inc. v. F.C.C.* for the proposition that the government may "grant exceptions to its rules." 811 F.2d 664, 674 (D.C. Cir. 1987). DDOT's reliance on *Orange Park* is fatally flawed for two reasons. First, *Orange Park*'s holding that the government may sometimes depart from its rules has one important condition—that the departure must not involve deprivation of a vested interest. *See id.* Here, as Spin has established above, DDOT deprived Spin of its liberty and property interests under due process. *See supra* Section III.C. Because DDOT does not satisfy this condition, *Orange Park*'s grace does not extend to DDOT. Second, *Orange Park* is not an equal protection case. Accordingly, its teaching provides limited to zero guidance on this Court's equal protection analysis.

DDOT's decision to violate its own rules just to provide selective preferential treatment to Bolt, which is a direct competitor to and on equal ground with the other applicants, ran afoul of the Equal Protection Clause. *See Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008); *Vill. Of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000).


**CONCLUSION**

The Court should grant Plaintiffs' Motion for Preliminary Injunction.

Dated: April 11, 2025

Respectfully submitted,

**HUSCH BLACKWELL LLP**

_/s/ Michael Klebanov_
Hal J. Perloff (DC Bar #461716)
1801 Pennsylvania Avenue, NW, Suite 1000
Washington, DC 20006-3606
Telephone: (202) 378-2354
Facsimile: (202) 378-2319
hal.perloff@huschblackwell.com

and

Michael Klebanov (_admitted pro hac vice_)
1801 Pennsylvania Ave., NW, Suite 1000
Washington, D.C. 20006-3606
Telephone: (202) 378-2363
Facsimile: (202) 378-2319
michael.klebanov@huschblackwell.com

Joseph S. Diedrich (_admitted pro hac vice_)
1801 Pennsylvania Ave., NW, Suite 1000
Washington, D.C. 20006-3606
Telephone: (608) 258-7380
Facsimile: (202) 378-2319
michael.klebanov@huschblackwell.com

**_Attorneys for Plaintiff_**

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on this 11th day of April 2025, I electronically filed the foregoing by using

the CM/ECF system.

*/s/ Michael Klebanov*