**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PHEENIX USH LLC *d/b/a* SPIN, | |
| Plaintiff, | Case No. 25-cv-922 (JMC) |
| v. | |
| DISTRICT DEPARTMENT OF TRANSPORTATION, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

Plaintiff Pheenix Ush LLC, doing business as "Spin," moves for a preliminary injunction to prevent Defendant District of Columbia Department of Transportation (DDOT) and five of its officials (together, "Defendants") from compelling Spin to remove its shared electric scooters and e-bikes from D.C. public spaces. Absent a preliminary injunction, Spin must remove its devices in short order because the DDOT denied it permits to continue offering them in the District. Spin claims that the DDOT's permit denial violated the company's Fifth Amendment rights to due process and equal protection and constituted arbitrary and capricious agency action under D.C. law. The Court finds Spin unlikely to succeed on the merits of any of its claims and will therefore **DENY** Spin's motion for preliminary injunction.[1]

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

I.     BACKGROUND

   A.  Statutory and Regulatory Framework

   Under D.C. statutory law, companies seeking to offer "shared fleet devices" such as electric scooters and electric bicycles ("SFDs") must apply for a permit with the DDOT. D.C. Code § 50–2201.03c(a). The statute authorizes the DDOT to set rules governing the application process, and it allows the agency to grant permits either to no SFD operators or any number of SFD operators greater than two. *Id.* §§ 50–2201.03c(b)(1), (b)(3).

   Pursuant to that authority, the DDOT has promulgated rules for selection of SFD operators in the District, as well as for the terms and requirements of such permits. *See* 24 D.C.M.R. §§ 3314, 3317. Those rules provide that the DDOT "may issue no more than nine (9) shared fleet device permits, during a permit period, and may permit fewer if the Director determines that doing so would be in the interest of protecting public safety, preventing negative transportation impacts, or ensuring reasonable enjoyment of the public space." *Id.* § 3314.24. Of those, no more than five may be for "electric mobility devices" (i.e., scooters). *Id*; *see* ECF 1-2 at 2. Such permits each have a term of 24 months. 24 D.C.M.R. § 3314.6. The previous set of SFD permits expired on December 31, 2024, and the current set of permits will expire on December 31, 2026. *See id.*; ECF 1-1 at 7; 24 D.C.M.R. §§ 3314.6.

   The DDOT's regulations require the agency to publicize the SFD application process and release an accompanying "administrative issuance" that outlines a "points-based scoring system" for evaluating applications along a set of enumerated criteria like "equity and affordability," "safety," and "innovation." 24 D.C.M.R. §§ 3317.1–4. For the 2025–2026 permit cycle, the DDOT issued its administrative issuance in October 2024 outlining the following four-point scoring rubric for each application question:

- 0 ratings fail to meet the criteria established in the regulations or offer solutions that may worsen or create additional challenges and/or limitations to fulfilling the respective criteria.

- 1 ratings meet the minimum regulatory standards and offer rudimentary solutions, claim[ing] the minimum level of commitment and ability to solving known challenges and concerns.

- 2 ratings meet the minimum regulatory standards and offer basic or typical, but unexceptional solutions, claiming a moderate level of commitment and ability to solving known challenges and concerns.

- 3 ratings significantly exceed the minimum requirements or display more detailed approaches demonstrating (with specific testing, demonstrations, or research and development) a higher level of commitment to solving known challenges and concerns.

- 4 ratings substantially exceed the minimum requirements, display unique or innovative approaches demonstrating (with specific case studies, past performance, or independently verifiable data) the highest level of commitment and ability to solving known challenges and concerns, and have been exhibited effectively in the District or other markets.

ECF 1-1 at 9.[2] An "Evaluation Committee" of at least two DDOT representatives scores the applications pursuant to that point-based scoring system and the published criteria. *Id.* §§ 3317.5–6. The administrative issuance also included question-by-question guidance on how applicants should answer the various questions and what specific information they should provide. *See* ECF 1-1 at 10–14.

The regulations also create an appeals process within the DDOT for applicants denied a permit who "believe[] the Evaluation Committee incorrectly scored a permit application." 24 D.C.M.R. § 3317.8. Such an appeal may be made on three bases:

1. That the DDOT "improperly or mistakenly applied the scored criteria to the appellant's original application";

---

[2] The administrative issuance provided a slightly different four-point rubric for questions regarding the applicant's "Past Performance," but that rubric is not at issue in this case. *See* ECF 1-1 at 9, 12–13.

2. That the DDOT "made a mistake in analyzing or calculating an applicant's final score (or a component thereof)"; and

3. That the DDOT "improperly deemed an application as incomplete." *Id.* § 3317.9.

A Hearing Officer appointed by the DDOT Director reviews those appeals and issues a final report recommending to the Director one of three courses of action:

1. "Dismiss[ing] the appeal in its entirety";

2. "Recalculat[ing] appealed scores the Hearing Officer believes were scored in error"; or

3. "[R]emand[ing] the application to the review panel for scoring," if the Hearing Officer finds the applicant was improperly disqualified from the application process. *Id.* §§ 3317.11–12.

The Director then makes a "final decision," which is not further appealable within the DDOT. *Id.* § 3317.13.

The administrative issuance for the 2025–2026 permit cycle included a section called "Important Dates" that included an "application deadline" of November 1, 2024, and a "[m]andatory device demo day" of November 4, 2024. ECF 1-1 at 7. The DDOT also circulated a "Permit Application Questions" document in late-October 2024. *See* ECF 1-2. One of the questions asked whether the DDOT "[w]ould be willing to grant a deadline extension" so that "operators [could] deliver more polished and targeted responses," to which the agency responded that "[a]n extension will not be granted at this time." *Id.* at 3. Another question asked whether the "demonstration on November 4" would be "scored as part of the application." *Id.* at 5. The DDOT responded that "[d]emonstrations will not impact the final score of the application, but applications will be considered incomplete without a demonstration." *Id.*

In addition, the administrative issuance indicated that permits would be "awarded" on January 1, 2025. ECF 1-1 at 7. And it included a sample, "not final" Permit Operator Agreement (POA) that it said each awardee would be required to sign, subject to "additional terms and conditions" being added "based on [an awardee's] application." *Id.* at 6. The sample POA provided for "immediate permit revocation" if the awardee did not "launch" its "permitted operations" within 30 days of January 1, 2025, the permit start date, and required the awardee to "immediately serve the entire District of Columbia upon the first day of permitted operations." ECF 1-3 at 13.

DDOT regulations also spell out consequences for revocation of a SFD permit. If the DDOT Director revokes an operator's permit, the operator "shall remove its devices from public space within seventy-two (72) hours." 24 D.C.M.R. § 3318.6.

### B. Factual Background[3]

#### 1. *Spin's Application*

Spin applied for two SFD permits in the 2025–2026 application cycle: one for e-scooters (referred to by the DDOT as Permit A) and one for e-bikes (Permit B). ECF 1 ¶ 63. Spin is an incumbent provider, having received permits to offer both types of SFDs in the District since 2019. *Id.* ¶ 15. In the 2023–2024 application process, Spin received the highest score of any applicant. *Id.* ¶ 16. In the 2025–2026 process, however, Spin received only the third highest score for each permit. *Id.* ¶ 66. On November 15, 2024, the DDOT notified Spin that it would not receive either Permit A or Permit B for the 2025–2026 permit cycle. *Id.* ¶ 64. Instead, the DDOT had awarded each permit to two other operators who received higher scores than Spin, including a company called Bolt. *Id.* ¶ 40.

---

[3] The Court draws these facts from Spin's verified complaint, ECF 1, its motion for TRO or preliminary injunction, ECF 3, Defendants' response, ECF 13, Spin's sealed supplemental filing, ECF 15, and the attachments to those documents.

### 2. *Bolt's Application*

Bolt, a non-U.S. company and first-time permit applicant in D.C., also applied for Permits A and B in the 2025–2026 cycle. *See id.* On October 15, 2024, before the DDOT had published the application details, a representative of Bolt emailed DDOT employees stating that Bolt "understands that DDOT is seeking to demo the product the week of 11/4" and asking whether the agency would be "willing to accommodate the week of 11/11" instead "given international shipping and travel schedules." ECF 13-1 at 5. A DDOT employee responded in the affirmative, stating that the agency "can accommodate a live demo" during that week. *Id.* at 4–5. The agency held Bolt's live demo on November 12, 2024, *id.* at 1, whereas other applicants' "[m]andatory device demo day" was November 4, *see* ECF 1-1 at 7.

Ultimately, Bolt received a permit to operate e-scooters in D.C., under Permit A. The DDOT also awarded a Permit A permit to another incumbent operator, and it awarded Permit Bs to two incumbent operators. Apr. 11, 2025 Hr'g Tr. 66:9–12. In total, the DDOT awarded two Permit A permits and two Permit B permits, making Spin the highest scoring non-awardee in both categories. *Id.* Tr. 66:14–17. Spin later learned that the DDOT had granted Bolt an "additional grace period" to launch operations "*after* January 1, 2025." ECF 1 ¶ 44.

### 3. *Spin's Appeals*

Spin submitted appeals of its two permit denials on the basis of "improper scoring." ECF 1 ¶ 67. After submission, Spin learned about the above-described "preferential treatment" of Bolt during the application process (specifically, extension of the live demo date), as well as the DDOT's use of what Spin called a "secret scoring rubric" during the scoring process. *Id.* ¶ 68. As proof of this secret rubric, Spin points to an email sent on November 5, 2025, from DDOT micromobility coordinator Defendant Ted Randell to two other DDOT employees (Defendants

William Feeney and Aaron Goldbeck) with the subject line "Scoring Criteria." ECF 1-5 at 2. Randell and the two other employees were, together, the three "scoring committee members" who reviewed and scored the SFD permit applications. ECF 1-8 at 5. In that email, Randell stated that its purpose was to "open a thread here for questions or clarifications on scoring criteria." ECF 1-5 at 2. The email then stated that the "current [scoring] rubric emphasizes meeting or exceeding District Regulations, innovation, and performance." *Id.* It went on to state the following about the scoring system:

> A score of '2' will effectively be an "average" score, where the operator is restating a requirement or simply meeting the standards of the industry or offering examples of previous solutions or outcomes that are unexceptional. 3s and 4s should be given only when an operator can effectively exhibit "higher" or "highest" level of commitment and has some proof to back it up, rather than simply promising an outcome.

*Id.* Below that statement and three other bullet points with logistical instructions about the scoring process (e.g., "Please consolidate scores on a single scoring sheet"), the email then recited verbatim the "official" descriptions of the 4-point system publicized in the administrative issuance. *Compare id.*, *with* ECF 1-1 at 9. Randell's email also included an attached spreadsheet called "SFD Scoring rubric and questions Template" that the reviewers used to record their scores. ECF 1-5 at 2. In each section of the spreadsheet, corresponding to each application question category, the template restated the official descriptions of the scoring system from the administrative issuance. *See id.* at 4–6.

On December 30, 2024, after learning of this so-called "secret" criteria and the "preferential treatment" of Bolt during the application process, Spin sent a letter to the designated DDOT Hearing Officer, Defendant Karen Calmeise, requesting an evidentiary hearing to address "outstanding issues of material fact." ECF 1 ¶ 69; ECF 1-6 at 2. These issues included the "DDOT's scoring criteria and its application of its scoring criteria to questions in Spin's

Applications," as well as the DDOT's "preferential treatment to other applicants," specifically Bolt, and its "policy regarding exceptions and the panelists' decision to not disclose" that "preferential treatment." ECF 1-6 at 2–3. Spin said such a hearing was "necessary for DDOT to properly consider Spin's appeal." *Id.* at 3. Calmeise responded to Spin on February 20, 2025, stating that she did not find a "formal 'in-person' hearing [to be] necessary" because "[t]he issues for [her] determination [were] not dependent on credibility or [the] need to view witness testimony." ECF 1-7 at 2.

Meanwhile, on January 17, 2025, Spin submitted a second set of appeals detailing its full range of objections to DDOT's scoring of Spin's application and its purported preferential treatment of Bolt. ECF 1 ¶ 74; *see* ECF 15 (filed under seal). And on March 11, 2025, Calmeise issued a report and recommendation denying each of the claims in Spin's amended appeal. ECF 1-8. First, as to use of a "secret" scoring criteria, Calmeise found that the language used in Randell's email to describe scores 2 and 3 "d[id] not significantly differ from the language presented in the [administrative issuance]" and was "merely a restatement of the published score criteria." *Id.* at 6–7. Calmeise then reviewed Spin's objections to the reviewers' scores and found that their scoring comments "complied with the published score criteria" and did not suggest use of a contradictory "secret" criteria. *Id.* at 7–9. For instance, Calmeise acknowledged Spin's complaint that some reviewer comments referred to "industry standards," a term found in Randell's email but not in the published criteria. *Id.* at 8–9. But she agreed with the DDOT that "[t]he application of industry standards to the scoring criteria [was] not contradictory to the published criteria" because "[a] scoring process that is 'blind' to the best practice of an industry would not be in the best interest of the District." *Id.* at 9. She further found that the "standards of the industry" term in the Randell email was "virtually synonymous" with the published criteria's

use of the term "minimum regulatory standards" and that the published criteria "require[d] the applicant to highlight their accomplishments by showing that the operations will be better and/or provide higher services than regulatory/industry standards." *Id.* at 7.

As to Spin's complaint of "preferential treatment" accorded to its competitor, Bolt, Calmeise concluded that it fell outside her review authority under the applicable DDOT regulation, 24 D.C.M.R. § 3317.9, "because these concerns are not matters of miscalculation or mistake in the score ratings" and "the grounds for review . . . do not extend to complaints of other applicants['] application process." ECF 1-8 at 9. And after rejecting Spin's remaining arguments as also outside the scope of her review (including due process and equal protection challenges at issue in this case), Calmeise recommended dismissal of Spin's appeal in its entirety. *Id.* at 10. She issued nearly identical recommendations as to Spin's Permit A (scooters) appeal and Permit B (bikes) appeals. *Compare* ECF 1-8 (Permit A appeal recommendation) *with* ECF 1-9 (Permit B appeal recommendation).

On March 26, 2025, Defendant Sharon Kershbaum, Director of the DDOT, issued a decision upholding Calmeise's recommendations and confirming that permits would not be issued to Spin for the 2025–2026 period. ECF 1-10 at 2. Kershbaum's decision further stated that Spin would be "welcome to apply in any future application periods." *Id.* Finally, the decision stated that the DDOT "now consider[ed] [Spin's] shared fleet device permit in a state of revocation" and thus that "all Spin devices must be removed from the public right of way within 72 hours of the date of this letter" pursuant to 24 D.C.M.R. § 3318.6. *Id.*

The next day, the DDOT informed Spin that it would delay that 72-hour removal deadline until April 6, 2025, "'as long as Spin [was] demonstrating efforts to remove devices' and 'displaying downward deployment trends.'" ECF 1 ¶ 84 (quoting ECF 1-11 at 2).

### 4. *This Suit*

Spin challenged the DDOT's permit denial decisions in a suit filed in this Court on March 28, 2025. ECF 1. In a verified complaint, Spin challenged the denial as arbitrary and capricious under D.C. law, as a violation of Spin's procedural and substantive due process rights under the Fifth Amendment, and as a violation of Fifth Amendment equal protection. *Id.* ¶¶ 87–127.[4] That same day, Spin filed a motion for temporary restraining order and preliminary injunction that would preserve the "status quo" by "allowing Spin to continue to operate [its SFDs] as it has been for the past six years, while the merits of this case are resolved." ECF 3 at 2. And it asked that the Court grant a TRO or administrative stay by April 2 to give Spin time to withdraw its scooters in advance of the agency's April 6 removal deadline. *Id.*

The Court held a TRO hearing on April 1, 2025, with all Parties present. *See* Apr. 1, 2025 Min. Entry. There, the DDOT agreed to postpone the deadline for Spin to remove its SFDs from D.C. public space until April 25, 2025, to allow the Parties to fully brief Spin's motion for preliminary injunction and the Court to decide it. Defendants filed their opposition to Spin's motion on April 8, 2025, ECF 13, and Spin replied on April 11, ECF 14. The Court held a hearing on the motion on April 11, 2025. *See* Apr. 11, 2025 Min. Entry. Spin submitted a supplemental sealed filing on April 14 that included Spin's complete amended appeal that it had submitted to the DDOT Hearing Officer, along with the DDOT's response. ECF 15.

## II. LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To prevail

---

[4] Spin also included a count for "Injunctive Relief" and another for "Declaratory Judgment," which the Court construes as remedies sought rather than legal claims. *See* ECF 1 ¶¶ 128–47.

on a preliminary injunction motion, the movant "must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). However, "without a likelihood of success on the merits," the movant is "not entitled to a preliminary injunction regardless of their showing on the other factors." *Brown v. Fed. Election Comm'n*, 386 F. Supp. 3d 16, 24 (D.D.C. 2019) (citing *Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009)).

## III.    ANALYSIS

Spin fails to show that it is likely to succeed on the merits of any of its claims, a failure fatal to its preliminary injunction motion. The Court assesses Spin's due process, equal protection, and D.C. administrative law claims and finds all of them wanting.

### A.  Due Process

Spin claims that the DDOT's "handling and subsequent denial of Spin's [permit] application[s]" violated Spin's substantive and procedural due process rights. ECF 3 at 25. According to Spin, it was deprived of its liberty interest in "pursuing [its] chosen trade or profession," namely providing SFD services in the District—as well as its property interest in the SFD permits—without a rational basis and without adequate procedures like an evidentiary hearing. *Id.* at 25–27; ECF 14 at 15–17. Defendants counter that Spin has not shown a protected interest and, even if it did, Spin was given sufficient process to challenge the DDOT's denial decisions.

The Court agrees with Defendants that Spin has not established the requisite protected interest to trigger either substantive or procedural due process protections, and Spin's claim fails

as a result. Substantive and procedural due process claims both demand a threshold showing that the defendant "deprived [the plaintiff] of a constitutionally cognizable liberty or property interest." *Doe v. District of Columbia*, 206 F. Supp. 3d 583, 604 (D.D.C. 2016) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720–22 (1997); *Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014)). Spin establishes neither.

Start with Spin's asserted liberty interest. Spin contends that it has a liberty interest equivalent to the recognized liberty interest in an individual or business "pursuing their chosen trade or profession." ECF 3 at 25–26. Spin points to cases holding that "formally debarring a corporation from government contract bidding constitutes a deprivation of liberty that triggers the procedural guarantees of the Due Process Clause." *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003). But the instant case is not equivalent to formal debarment. In the contract debarment cases, a business is prohibited from bidding on or participating in a government program, such as Medicare, often for an indefinite period. *See ABA, Inc. v. District of Columbia*, 40 F. Supp. 3d 153, 166–167 (D.D.C. 2014). Here, Spin merely lost a permit competition (in which it was allowed to compete) for two specific two-year permits, and nothing prohibits it from entering the competition again for the next permitting cycle. To the contrary, the DDOT Director stated in her denial letter that Spin was "welcome to apply in any future application periods." ECF 1-10 at 2.

To that fact, Spin responds that even a temporary debarment still counts as an infringement of a protected liberty interest. Thus, that Spin lost a permit only for two years would still suffice. ECF 14 at 16. But neither of the two cases Spin cites for that proposition conducted a constitutional due process analysis or found a protected liberty interest. *See Horne Bros., Inc. v. Laird*, 463 F.2d 1268 (D.C. Cir. 1972); *Friedler v. Gen. Servs. Admin.*, 271 F. Supp. 3d 40 (D.D.C. 2017). Instead,

both involved compliance with regulatory requirements associated with federal contract debarment. Spin offers no other authority for its claim that merely losing a competition for a two-year permit constitutes formal debarment.

D.C. Circuit precedent offers Spin another path, but Spin cannot navigate its way there, either. The Circuit has held that "government action precluding a litigant from future employment opportunities will infringe upon [its] constitutionally protected liberty interests only when that preclusion is *either* sufficiently formal *or* sufficiently broad." *Taylor v. Resol. Tr. Corp.*, 56 F.3d 1497, 1506 (D.C. Cir.), *amended on reh'g*, 66 F.3d 1226 (D.C. Cir. 1995) (emphasis added). To establish that its preclusion is broad enough, even if not formal enough, to trigger protection, Spin must show that it has been "effectively foreclosed" from government contracting or employment opportunities by virtue of defamatory statements that "effectively put [it] out of business." *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 963–64 (D.C. Cir. 1980); *see also Trifax Corp.*, 314 F.3d at 644. In such cases, "when the Government effectively bars a contractor from virtually all Government work due to charges that the contractor lacks honesty or integrity, due process requires that the contractor be given notice of those charges as soon as possible and some opportunity to respond to the charges before adverse action is taken." *Trifax Corp*, 314 F.3d at 644 (quoting *Old Dominion*, 631 F.2d at 955–56); *see also Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594 (D.C. Cir. 1993), *as amended on denial of reh'g* (Mar. 26, 1993).

But that circumstance does not apply here, either. At no point in the permit application process, appeal, or denial did Defendants publicly charge Spin with lacking honesty or integrity, nor did they make other affirmative statements that would harm Spin's reputation. Instead, the DDOT merely gave Spin the third highest score out of eight in the permit competition, which was

not enough to win.[5] *See* ECF 1-8 at 3 (Hearing Officer finding that Spin received the third highest score in a "competitive" process).

Indeed, the caselaw makes clear that being denied a permit in a competitive bidding process is not the same as debarment from government contracting. In the federal context, from which the caselaw on debarment generally arises, debarment is defined as "'an administrative action which excludes nonresponsible contractors from government contracting' and 'effectuate[s] the [federal government's] policy that agencies shall solicit offers from, award contracts to, and consent to subcontracts with responsible contractors only.'" *Friedler*, 271 F. Supp. 3d 40 at 43 (quoting *Caiola v. Carroll*, 851 F.2d 395, 397, 398 (D.C. Cir. 1988)). But Spin has not been excluded from government contracting; to the contrary, it was allowed to bid for a contract of a sort (a permit), lost, and will be allowed to bid again in the next cycle. It has not been found ineligible for future permits, nor has it been found to be "nonresponsible." *Id.*

Finally, Spin attempts to rely on cases involving individuals denied licenses to practice their profession. But first, none of the cases Spin cites involve a corporation; all involve individuals seeking, and being precluded from, individual employment. *See, e.g.*, *Greene v. McElroy*, 360 U.S. 474 (1959); *Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994). The D.C. Circuit has applied that same basic principle to the context of corporations through its contract debarment cases. *See Trifax*, 314 F.3d at 643. And, as discussed above, this case does not meet the debarment cases' requirements. Without a case on point that finds a liberty interest in an international corporation's winning of a two-year permit to operate within a single city, this Court cannot find a likelihood of

---

[5] To be sure, Spin does allege reputational harm flowing from Defendants' decision: that Spin will lose customer goodwill when customers can no longer find Spin devices on D.C. streets. ECF 3 at 29. But Spin characterizes that harm as part of its irreparable injury, not as a harm supporting a protected interest for due process purposes. And indeed, Spin cites no case finding a protected liberty interest where the requisite reputational harm came not from a statement of the government but instead as a follow-on consequence of the government's non-defamatory contract or license denial.

success on the merits of Spin's liberty-interest claim at this point. Spin's argument would effectively subject every competitive municipal business-permit process to constitutional scrutiny, and Spin offers no binding authority for such a sweeping rule.

Changing tack, Spin argues for the first time in its reply that it also has a protected property interest in the permit it lost to its competitors through the challenged DDOT process. ECF 14 at 16–17. For support, Spin cites the D.C. Circuit's rule outlined in *3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068 (D.C. Cir. 2003), as well as a D.C. Superior Court case applying that rule. *See Bird Rides, Inc. v. D.C. Dept. of Transp.*, No. 2023-CAB-00316, at 9-10 (D.C. Super. Ct. Sept. 20, 2023). Spin contends that, under those cases, it has a protected property interest in the 2025–2026 permits because (a) it submitted its permit application and was denied the renewed permits before its prior permits expired, as in *Bird Rides*, and (b) Spin's application answers for this cycle were "just as good if not better than those from the last application cycle," the number of permits the DDOT granted was the same as last cycle, and thus Spin had more than a "unilateral expectation" that it would get another permit. ECF 14 at 17.

But those facts do not suffice to create a property interest under *3883 Connecticut.* This case concerns Spin's eligibility for a new permit. To determine whether an applicant has a protected property interest in a new permit, the D.C. Circuit asks whether the applicant had "more than a unilateral expectation in the permit it seeks" based on decision-making officials' "discretion to approve [the] application" under the applicable laws and regulations. *3883 Conn.*, 336 F.3d at 1072. As the Fourth Circuit has held, in a case cited approvingly by the D.C. Circuit, "[a]ny significant discretion conferred upon the local agency" in granting the permit "defeats the claim of a property interest." *Gardner v. City of Balt. Mayor & City Council*, 969 F.2d 63, 68 (4th Cir. 1992) (cited in *3883 Conn.*, 336 F.3d at 1072). Here, the D.C. statute and regulations give the

DDOT discretion to pick new permit holders based on its assessment of each applicant's performance on a set of criteria. *See* 24 D.C.M.R. §§ 3317.2–6. Those regulations do not require the agency to grant a permit or renew a previously held permit, nor do they create mandatory or automatic conditions for renewal. *See id.* In fact, by setting a cap on the number of permits selected, the statute and regulations contemplate that not every applicant will receive a permit. *See* D.C. Code § 50–2201.03c(b)(3) (granting the DDOT the authority to grant either no shared fleet device permits or any number of permits greater than two); 24 D.C.M.R. § 3314.24 (allowing the issuance of no more than nine permits for shared fleet devices, including no more than five for electric mobility devices, and allowing selection of fewer than that "if the Director determines that doing so would be in the interest of protecting public safety, preventing negative transportation impacts, or ensuring reasonable enjoyment of the public space"). That regulatory context defeats a property interest claim under D.C. Circuit caselaw. *See also Lopez v. Fed. Aviation Admin.*, 318 F.3d 242, 249 (D.C. Cir. 2003), *as amended* (Feb. 11, 2003).

Nonetheless, Spin points to *Bird Rides* for the proposition that it had a property interest in renewal of its SFD permits because it applied for the 2025–2026 permits while its 2023–2024 permits were still active. *See Bird Rides*, No. 2023-CAB-00316 at 9. The Superior Court's opinion does support that proposition, and it concerned precisely the same regulatory context as this case (albeit for the previous application cycle). But this Court respectfully departs from the Superior Court judge's holding. That court reasoned from an opinion of another judge in this District, *Psychas v. District Department of Transportation*, which held that a permit applicant did not have a protected property interest in a permit that had already expired. No. 18-cv-0081, 2019 WL 4644503 (D.D.C. Sept. 24, 2019). In *Psychas*, the plaintiffs claimed that they had a protected property interest in a DDOT building permit granted on November 9, 2015, and disputed the

contention that the permit had an expiration date or was temporary even though by its terms it had "effective dates of November 9 through November 20, 2015." *Id.* at *2, *12. Instead, those plaintiffs argued, their permit had been "constructively revoked" without due process. *Id.* at *11. Judge Berman Jackson disagreed on the facts, finding that the November 2015 permit's stated expiration date was indeed an expiration date, and that the plaintiffs therefore did not have an ongoing property interest in that permit after that date. *Id.* at *11–12. In so holding, Judge Berman Jackson compared those facts with the facts of *3833 Connecticut*, which found a protected property interest in an "active" (i.e., not-expired) permit. *Id.* at *12. The *Bird Rides* court reasoned from that analysis that an SFD permit holder had a protected property interest in continued operations of its SFDs in the District because it applied for new permits while its prior permits were still active. *Bird Rides*, No. 2023-CAB-00316 at 10.

Despite some argumentative gymnastics on Spin's part, this Court finds no property interest here. Spin contends that it, like the plaintiff in *3883 Connecticut*, had a protected property interest in an active permit—namely, the 2023–2024 SFD permits it had previously been awarded, which had not yet expired by the time Spin applied for the 2025–2026 permits. ECF 14 at 17. But *3883 Connecticut* held only that such a permit holder has a protected interest in the "continued effect" of the permit it already holds, and only to the extent that the granting official lacks "discretion to revoke or suspend the permit." 336 F.3d at 1072. If, and only if, the relevant laws and regulations create "an expectation in the continued effect of the permit[]" due to officials' lack of discretion to revoke it, then the holder has a property interest in it. *Id.* at 1073. Spin's problem is that it cannot explain how it could have an expectation in the continued effect of permits that, by the governing regulations' clear terms, expired at the end of 2024. *See* 24 D.C.M.R. 3314.6(b). Even though Spin purports to claim a protected interest only in the 2023–2024 permits that it was

already awarded, ECF 14 at 16, its argument functionally seeks a protected interest in the 2025–2026 permits—the only thing Spin claims Defendants denied it. In *3883 Connecticut* and *Psychas*, by contrast, the plaintiffs claimed (in one case correctly and in the other incorrectly) that their previously awarded permits had ongoing effect of which the government deprived them. Here, the governing statutes and regulations plainly disabled the effect of the 2023–2024 SFD permits after the end of 2024. After that point, all Spin had were expired permits and a denied application for new permits. Neither affords it a property interest.

Spin advances one final argument, to no avail. Spin contends that it had more than a "unilateral expectation" in winning a permit to operate after the end of 2024 because its responses in the 2025–2026 application cycle were "just as good if not better than" its 2023–2024 responses. ECF 14 at 17. Yet, Spin points to nothing in the permit statute or regulations, or DDOT guidance or communications, suggesting that a permit would be awarded as long as the responses were at least as good as before. To the contrary, the regulations provide that applications "shall be scored by an Evaluation Committee" every two-year cycle based on a scoring system issued "in advance of the permit application" for each process, and it clearly envisions a competitive process in which prior permit holders and new applicants compete under the same rubric and not all will get a permit. 24 D.C.M.R. 3317.4–5. Spin provides no binding, or even persuasive, caselaw finding a protected property interest on such facts, and the reasoning of *3883 Connecticut* and the cases it cites precludes such a finding.

In short, Spin is unlikely to succeed on the merits of its due process claim because it has no protected liberty or property interest in the permits that Defendants denied it.

**B. Equal Protection**

Next, Spin brings an equal protection claim on the basis that one of its competitors, Bolt, received preferential treatment in the permit application process and was awarded a permit over Spin as a result. ECF 3 at 28–29. According to Spin, that preferential treatment took two forms. First, it claims, the DDOT unfairly granted Bolt an exception to what Spin says was a mandatory deadline for an in-person demonstration for which the DDOT said it would offer no extensions. *Id.* at 28. And second, Spin alleges, the agency granted Bolt an extension from the requirement to commence operations in the District on January 1, 2025, the permit start date. *Id.* According to Spin, the DDOT offered Spin neither of those accommodations and thereby treated Bolt more favorably—and did so without any rational basis. The Court finds that claim, too, unlikely to succeed.

To establish an equal protection violation for a "class of one," a plaintiff must show "(1) disparate treatment of similarly situated parties (2) on no rational basis." *3883 Conn.*, 336 F.3d at 1075 (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Spin's claim likely fails at the first prong. As Defendants argue, Spin and Bolt were not similarly situated in the relevant sense such that any difference in treatment raises an equal protection issue.

With regard to extension of the in-person demonstration date, Defendants note that only Bolt requested an extension of that date; Spin never requested such an extension. ECF 13 at 12; *see* ECF 13-1 at 5. Indeed, as Defendants point out, Bolt requested an extension even before the DDOT had announced a date. *See id.* Spin insists that it did not request an extension because the application Q&A that the DDOT released in late-October 2024 stated that such extensions would not be granted. ECF 3 at 12. Yet, as Defendants argue, that question in the Q&A document is best read to reference the deadline for the written application (referring to applicants' desires to provide

"polished and targeted responses"), *see* ECF 1-2 at 3, 5, not the demonstration, which is discussed in a different Q&A and which post-dated the November 1 "[p]ermit application deadline." ECF 1-1 at 7. Thus, there is no evidence in the Q&A that Spin or other applications could not have requested a different demo date, as Bolt did. Further, even if the Q&A could be read to generally preclude extensions, the record evinces a facially legitimate reason for giving Bolt an extension upon request: the "international shipping and travel schedules" that Bolt raised in its request email. ECF 13 at 2 (quoting ECF 13-1 at 5). Spin does not contest the truth of that reason, nor does it offer more than a speculative suggestion that the reason was pretextual. *See* Apr. 11, 2025 Hr'g Rough Tr. 20:23–21:12 (suggesting, admittedly without "sufficient evidence," that the DDOT denied Spin a permit in order to effectuate an ulterior motive of reducing the total number of scooters on D.C. streets, which the DDOT allegedly considered but failed to do through a rulemaking process and thus "had to find another way to make that happen").

The January 1, 2025, launch deadline, which appears in the sample Permit Operator Agreement (POA) attached to the administrative issuance, is even less helpful to Spin. For one thing, Spin was not similarly situated to Bolt at that stage because it never even made it to the point of signing a POA for the 2025–2026 cycle. Thus, we do not know if Spin would have received an extension to the launch date if, for whatever reason, it asked for one. That fact alone dooms Spin's claim on this point. Even worse for Spin, the administrative issuance made clear that the sample POA was "not final" and "applicants may have additional terms and conditions written into their POA based on their application." ECF 1-1 at 6. Thus, the sample POA erected no barrier to the DDOT extending Bolt's January 1 launch date, as the DDOT could simply add a term or condition to Bolt's final POA providing for such an extension. Finally, though it does not much matter, even the sample POA did not require a launch on January 1; it required a launch within 30 days of

January 1. *See* ECF 1-3 at 13 (providing for "immediate permit revocation" if the awardee did not "launch" its "permitted operations" within 30 days of January 1, 2025, the permit start date, and required the awardee to "immediately serve the entire District of Columbia upon the first day of permitted operations"). And all the record in this case indicates is that, according to Spin, Bolt had not launched operations as of January 17. ECF 1 ¶¶ 46, 74. Accordingly, the alleged extension appears perfectly consistent with the agency's guidance and not an exception at all.

Spin's equal protection argument therefore stalls out.

### C.  D.C. Administrative Law

Spin's final claim asserts that Spin's permit denial decision was arbitrary and capricious in violation of D.C. administrative law. ECF 3 at 10–25. Because the Court finds Spin unlikely to succeed on the merits of its federal claims, the Court must first determine whether it is likely to exercise supplemental jurisdiction over that claim. *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (explaining that, in the preliminary injunction context, likelihood of success on the merits includes "a likelihood of . . . establishment of jurisdiction"). The Court would likely not exercise such jurisdiction. But even if it did, Spin's D.C.-law claim would likely fail. Either way, preliminary injunctive relief on this claim is not warranted.

#### 1.   *The Court will likely decline to exercise supplemental jurisdiction*

A federal court may exercise subject matter jurisdiction over state-law (including D.C.-law) claims that "derive from" the same "common nucleus of operative fact" as any federal claims such that "the relationship between the federal claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional case." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1997) (quoting *Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)); *see* 28 U.S.C. § 1367(a). That decision lies within the district court's discretion, and

the court "may decline to exercise supplemental jurisdiction over [such] a claim" if, *inter alia*, the court "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3); *see Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1266 (D.C. Cir. 1995). In exercising its discretion, district courts should weigh "considerations of judicial economy, convenience and fairness to litigants." *Gibbs*, 383 U.S. at 726. As the Supreme Court has explained, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Id.*

When it comes to D.C. administrative law claims, courts in this Circuit have expressed a strong preference—if not a firm rule—against district courts' exercise of supplemental jurisdiction once all federal claims have been dismissed. *See Lightfoot v. D.C.*, 448 F.3d 392, 399 (D.C. Cir. 2006) (instructing that the district court "should dismiss" a claim brought under the D.C. Administrative Procedure Act (DCAPA) if "there are no longer any viable federal claims in this suit," and calling a federal court reviewing a D.C. agency an "anomaly"); *Robinson v. Palmer*, 841 F.2d 1151, 1157 (D.C. Cir. 1988) (holding that DCAPA suits without federal claims are "more properly decided in the first instance by the local courts of the District of Columbia"). Applying that Circuit precedent, another judge in this District denied a preliminary injunction on a DCAPA claim because the plaintiff was unlikely to succeed on the merits of its federal claims and the court would thus likely dismiss the DCAPA claim for lack of supplemental jurisdiction. *See Classic Cab, Inc. v. D.C.*, 288 F. Supp. 3d 218, 229–30 (D.D.C. 2018). Those cases counsel against supplemental jurisdiction here, too.

Spin pushes back, arguing that its D.C.-law claims does not arise under the DCAPA and thus that the aforementioned cases do not apply. ECF 14 at 9–10. Instead, Spin maintains, the

DCAPA "governs only 'contested' administrative cases," which this case is not. *Id.* at 9. To be sure, the DCAPA's judicial review provision applies by its terms only to "order[s] or decision[s] of the Mayor or an agency in a contested case." D.C. Code § 2–510(a). That provision confers exclusive jurisdiction for such suits on the D.C. Court of Appeals. *See id.*; *D.C., Dep't of Pub. Works v. L.G. Indus., Inc.*, 758 A.2d 950, 954 (D.C. 2000). And the Parties here agree that the challenged DDOT decision was not conducted as a contested case under the DCAPA. ECF 13 at 13; ECF 14 at 9; *see* D.C. Code § 2–502(8) (defining a "contested case" as "a proceeding before the Mayor or any agency in which the legal rights, duties, or privileges of specific parties are required by any law (other than this subchapter), or by constitutional right, to be determined after a hearing before the Mayor or before an agency); *id.* § 2–509 (prescribing procedures for contested cases). The Court agrees with Spin that, to the extent the caselaw in this Circuit concerns only contested cases, it would not apply here.

However, the caselaw does not appear so limited. Neither the *Lightfoot* nor *Robinson* courts stated that they were reviewing contested cases or that their supplemental jurisdiction holdings relied on such a finding. Rather, in both cases, the DCAPA challenge concerned the District agency's failure to use notice-and-comment procedures for a rulemaking as required under the DCAPA. *Lightfoot*, 448 F.3d at 398; *Robinson*, 841 F.2d at 1157. A rulemaking is not a contested case, and a challenge to it thus does not fall under the DCAPA's judicial review provision. *See Debruhl v. D.C. Hackers' License Appeal Bd.*, 384 A.2d 421, 425 (D.C. 1978) (distinguishing contested cases from rulemakings under the APA); *United States v. D.C. Bd. of Zoning Adjustment*, 644 A.2d 995, 999 (D.C. 1994) (holding that rulemakings or other agency actions that do not have "contested case status" are "not the proper subject of [the D.C. Court of Appeals'] direct appellate jurisdiction"). Consistent with that reading, the district court in *Classic Cab* applied *Lightfoot* and

*Robinson* in finding jurisdiction unlikely over a challenge to a District agency rulemaking—also not a contested case. *See Classic Cab, Inc.*, 288 F. Supp. 3d at 229–30. Thus, this Court doubts Spin's argument that its challenge to the DDOT's non-contested-case administrative action does not "arise under" the DCAPA in the sense relevant for the *Robinson-Lightfoot* supplemental jurisdiction rule.

But the Court need not spin its wheels further on this slick terrain. That is because, even if the D.C. Circuit's cases did not compel this Court to deny supplemental jurisdiction, the Supreme Court's instructions in *Gibbs* counsel in that same direction. First and foremost, the *Gibbs* Court said that district courts "should" dismiss state claims "if the federal claims are dismissed before trial," as is likely here. 383 U.S. at 726. Second, federal courts should dismiss claims when "it appears that the state issues substantially predominate." *Id.* There is no question that the D.C. law claims make up the bulk of the Parties' briefing here. Third, D.C. local courts are more experienced with D.C. administrative agencies and administrative law, and so there is at least some judicial efficiency in having D.C. courts hear cases challenging D.C. administrative action.

All told, then, the Court is unlikely to exercise supplemental jurisdiction over Spin's D.C.-law claims. However, to the extent that further litigation and consideration could change the Court's assessment of its supplemental jurisdiction, the Court finds it prudent at this posture to preliminarily assess the merits of Spin's D.C.-law claim. And indeed, the Court sees some clear judicial efficiency in addressing Spin's merits claims in full for preliminary injunction purposes given the time pressures Spin is under to clear its vehicles from D.C. streets.

### 2. *Spin's D.C.-law claim is unlikely to succeed in any event*

If the Court did exercise supplemental jurisdiction over Spin's D.C.-law claim, the claim would still be unlikely to succeed on its merits. D.C. courts apply the same standard as applied in the context of the federal Administrative Procedure Act when assessing whether a D.C.

administrative agency's action is arbitrary and capricious, as Spin claims Defendants' actions were. *See Wilson v. D.C. Rental Hous. Comm'n*, 159 A.3d 1211, 1214 (D.C. 2017) (citing *Motor Vehicle Mfrs. Ass'n v State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Thus, D.C. agency action is arbitrary and capricious "if the agency has relied on factors which [the legislature] has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *State Farm*, 463 U.S. at 43).

Spin argues that Defendants' denial of the 2025–2026 SFD permits to Spin was arbitrary and capricious for five reasons. *See* ECF 3 at 11. The Court takes each in turn.

### i.    Preferential Treatment of Bolt

An agency acts arbitrarily and capriciously when it "fails to 'treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so.'" *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 78–79 (D.D.C. 2015) (quoting *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996)). Spin effectively repeats its equal-protection arguments here, pointing again to the in-person demonstration date and launch date extensions. ECF 3 at 12–13. Yet, as already explained, Spin and Bolt were not similarly situated for equal-protection purposes. *See supra* Section III.B. And for the same reasons, they did not present "similar cases" for arbitrary-and-capricious purposes. Thus, Spin's D.C.-law claim is unlikely to succeed on this basis.

### ii.    "Secret" Scoring Criteria

Next, Spin claims that the DDOT reviewers improperly applied the "secret" scoring criteria articulated in Randell's email to the other reviewers instead of the official scoring criteria

published in the agency's administrative issuance. ECF 3 at 14–19. If the reviewers had in fact applied a different scoring criteria than what the agency publicized, their decision very well could have been arbitrary and capricious. "It is 'axiomatic' . . . 'that an agency is bound by its own regulations," and "an agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA.*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Panhandle Eastern Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979); *Environmentel, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011)). Here, DDOT regulations require the agency to include its "points-based scoring system . . . in an administrative issuance released in advance of the permit application being published." 24 D.C.M.R. § 3317.4. The agency was therefore bound by regulation to apply the scoring system it released in its October 2024 administrative issuance. *See* ECF 1-1 at 9.

Yet Spin's claim falls short because Spin has not met its burden to show that the DDOT failed to apply its published scoring criteria. As the Hearing Officer found, the "secret" criteria in Randell's email did not meaningfully differ from the published criteria for a score of "2" or "3," as Spin claims. *See* ECF 1-8 at 6–7. Further, to the extent they differed in minor respects, the record does not show that the reviewers applied the "secret" criteria rather than the published criteria.

First take the criterion for a "2" score. Under the published scoring system in the administrative issuance, "2 ratings meet the minimum regulatory standards and offer basic or typical, but unexceptional solutions, claiming a moderate level of commitment and ability to solving known challenges and concerns." ECF 1-1 at 9. By comparison, Randell's email stated that "[a] score of '2' will effectively be an 'average' score, where the operator is restating a requirement or simply meeting the standards of the industry or offering examples of previous

solutions or outcomes that are unexceptional." ECF 1-5 at 2. Spin zeroes in on the term "standards of the industry," arguing that Randell's version "replace[d] 'minimum regulatory requirements' with 'industry standards,'" thereby introducing a concept that, unlike minimum regulatory requirements, are not defined in the D.C. Code or administrative issuance and, in any event, differ from the published criterion's standard. ECF 3 at 18.

But widen the aperture just a bit further, and it becomes difficult to see Randell's version as doing anything of the sort. The published criterion inquires into not just compliance with "minimum regulatory standards" but also whether the applicant's response "offer[s] basic or typical, but unexceptional solutions," and the extent to which it demonstrates a "commitment and ability to solve known challenges and concerns." ECF 1-1 at 9. It seems highly reasonable to consider "industry standards" when judging whether proposed solutions are "basic," "typical," or "unexceptional," and the extent to which they "solve known challenges and concerns." *Id.* The DDOT argued as much to the Hearing Officer, and the Hearing Officer agreed. *See* ECF 1-8 at 9. So, too, does the Court. What's more, Randell's email did not abandon the "regulatory requirements" concept; to the contrary, it clearly stated that "[t]he current rubric emphasizes meeting or exceeding District Regulations." ECF 1-5 at 2. Notably, all five of the scoring criteria (for scores of 0 through 4) referenced "minimum regulatory standards," "minimum requirements," or "the regulations," and a score of "1" also included the criterion that the response "meet[s] the minimum regulatory standards," just as the "2" score did. *See* ECF 1-1 at 9. So it makes perfect sense that Randell's email would emphasize what made the "2" score different from the others. Accordingly, Randell's criterion for a "2" score is perfectly consistent with the published version, and his email does nothing more than what it purports to do: offer "clarifications on scoring criteria." ECF 1-5 at 2. And further, the reviewers' use of the term "industry standards" in their

scoring comments therefore do not indicate any meaningful departure from the published criteria. *Contra* ECF 3 at 19 (pointing to reviewers' comments specifically referencing the "industry standard" as proof that the reviewers applied the wrong criterion).

Next take the dueling criteria for a "3" score, the other one Spin challenges. The published version states that "3 ratings significantly exceed the minimum requirements or display more detailed approaches demonstrating (with specific testing, demonstrations, or research and development) a higher level of commitment to solving known challenges and concerns." ECF 1-1 at 9. Randell's email said that "3s and 4s should be given only when an operator can effectively exhibit 'higher' or 'highest' level of commitment and has some proof to back it up, rather than simply promising an outcome." ECF 1-5 at 2. There, unlike for the "2" score, the Court can discern some potentially meaningful variation: Randell's version appeared to discard the possibility of earning a "3" through a response that "significantly exceed[s] the minimum requirements," and it instead allowed a "3" score "*only* when an operator can effectively exhibit 'higher' . . . level of commitment and has some proof to back it up." *Id.* (emphasis added); *see* ECF 3 at 18.

Yet, ultimately, this difference appears inconsequential. First, again, Randell's email stated early on that the scoring rubric as a whole "emphasizes meeting or exceeding District Regulations." ECF 1-5 at 2. So the reviewers were hardly instructed to "disregard[]" that aspect of the published criteria. ECF 3 at 19. Second, Spin points to no evidence, nor can the Court locate any in the record, that reviewers demanded "a higher level of commitment and certain proof," as Spin puts it, rather than merely applying the published criterion. *Id.* at 18. When pressed at oral argument, Spin offered just one example of an application question in which reviewers' comments purportedly indicated that they improperly demanded "proof to back . . . up" a claim rather than permitting a response that "significantly exceed[ed] minimum requirements." *See* Apr. 11, 2025

Hr'g Rough Tr. 14:18–15:4. However, upon review, the Court cannot discern in the reviewers' comments, filed under seal, a requirement of "a higher level of commitment and certain proof," as Spin's argument would have it. ECF 3 at 18. Instead, the comments show merely that two requesters gave a "2" score on that question because they found Spin's response lacking in detail. Requiring a more detailed response is not the same as requiring "proof" such as "specific testing, demonstrations, or research and development," as the published criterion states. ECF 1-1 at 9. Because those comments—which Spin held out as its best example on the "3" score criteria—are consistent with the published scoring criteria, Spin's claim that the reviewers applied the wrong criteria once again falls flat.

The record also includes other evidence that cuts against Spin's argument that the reviewers failed to apply the published criteria. For one thing, Randell's email included the verbatim published criteria right below his "clarifications." *See* ECF 1-5 at 2. For another, the scoring spreadsheets into which the reviewers inputted their scores included the verbatim published criteria next to each category of questions. *See* ECF 1-5 at 4–6; *see generally* ECF 15 (filed under seal). Additionally, the DDOT gave even more guidance in the administrative issuance in which it also published the scoring rubric, including tips for how to answer many of the specific questions on the application. *See* ECF 1-1 at 10–14. Spin provides no evidence that the agency disregarded that additional guidance or scored answers inconsistently with it. All told, then, the record simply cannot support Spin's claim that Defendants applied "secret" or improper scoring criteria when scoring Spin's application, and its D.C.-law claim likely fails on that basis, too.

### iii.    Arguments Heard by Hearing Officer

Spin's third D.C.-law argument against Defendants' denial decision asserts that the Hearing Officer that heard Spin's agency appeal "ignore[d]" some of Spin's arguments,

specifically those regarding the "DDOT's preferential treatment of Bolt" through extension of two deadlines. ECF 3 at 20–21. Hearing Officer Calmeise refused to consider those arguments as part of her review of the DDOT denial decision because she found them to be outside of her authority under the relevant regulation. *See* ECF 1-9 at 9 (citing 24 D.C.M.R. § 3317.9). According to Spin, that decision was "plainly erroneous or inconsistent with the regulation" and therefore arbitrary and capricious. ECF 3 at 19 (quoting *St. Vincent's Medical Center v. Burwell*, 222 F. Supp. 3d 17, 22 n.2 (D.D.C. 2016)).

Not so. 24 D.C.M.R. § 3317.9, the regulation governing a Hearing Officer's review, permits an appeal to a Hearing Officer only on the following three bases: that the agency (a) "improperly or mistakenly applied the scored criteria to the appellant's original application"; (b) "made a mistake in analyzing or calculating an applicant's final score (or a component thereof)"; or (c) "improperly deemed an application as incomplete." Spin is correct that, while item (a) applies only to the appellant's scores, item (b) can extend to review of another applicant's application. ECF 3 at 20. But (b), the item upon which Spin hangs its argument, concerns only "mistake[s]" in the analysis or calculation of an applicant's scores. As Calmeise explained in her opinion, the issue of preferential treatment or "bias" in favor of another applicant was not a "matter[] of miscalculation or mistake in the score ratings which are the sole issue to be reviewed in this Appeal process," and "the grounds for review for this Appeal do not extend to complaints of other applicants['] application process." ECF 1-9 at 9. Or, as Defendants put it at oral argument, the review provision Spin cites authorizes reviewing any applicant's *scores*, but not other aspects of their application process or *whether* they were scored at all, which is what Spin requested. Apr.

11, 2025 Hr'g Rough Tr. 55:24–56:9.[6] That distinction accords with the wording of the regulation, which encompasses mistakes made "in" calculating or analyzing a score, not mistakes made "by" calculating or analyzing (i.e., the mistake of advancing an applicant to the scoring phase altogether, which was Spin's complaint). *Id.*; 24 D.C.M.R. § 3317.9. And, consistent with all that, the agency explicitly stated in its Q&A document that the in-person demonstration (the component of the application process in which Bolt allegedly got preferential treatment) "will not impact the final score of the application." ECF 1-2 at 5.

Calmeise therefore did not err in disregarding Spin's preferential-treatment arguments in her review.

iv.    <u>Ignoring Evidence of Improper Scoring</u>

Spin challenges another aspect of Calmeise's review, too. According to Spin, Calmeise conducted too cursory a review of its objections to the DDOT's scoring of its two permit applications, "mak[ing] leaps in logic to quickly conclude—within two paragraphs—that the published rubric and the secret rubric were consistent with one another." ECF 3 at 21. Such "vague and conclusory" reasoning, Spin alleges, is not the "'reasoned decisionmaking' necessary to support an agency determination." *Id.* at 21–22 (quoting *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1363 (Fed. Cir. 2023); *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14, 24 (D.D.C. 2014)).

This Court cannot agree. First off, the Hearing Officer's analysis of this issue exceeded two paragraphs and instead spanned about four single-spaced pages. See ECF 1-9 at 6–9. Second,

---

[6] To be clear, the regulation separately provides for review of whether the agency "improperly deemed an application as incomplete," 24 D.C.M.R. § 3317.9, which does concern whether the applicant was scored at all. Appropriately, however, Spin does not rely on that aspect of the provision because Spin does not contend that Bolt's application was "improperly deemed . . . as *incomplete*," but rather than Bolt's application was improperly deemed as *complete*. *Id.* (emphasis added).

the Hearing Officer considered in some depth the specific scoring objections that Spin raised. And, like this Court, she "f[ou]nd the language in the Randell email does not present a 'secret criteria' but is merely a restatement of the published score criteria" and further that there was no evidence that application of the email rather than published scoring (if any) caused errors in the scores. For instance, the Hearing Officer considered the submissions of the Parties and found that "the application of industry standards to the scoring criteria is not contradictory to the published criteria." ECF 1-9 at 9.

Spin's objection amounts to an argument that the Hearing Officer's reasoning was imperfect and could have been clearer. Perhaps. But the Supreme Court instructs courts to "uphold a decision of less than ideal clarity" as long as "the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43. *See also Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 61 (D.C. Cir. 2015) ("[I]mperfection alone does not amount to arbitrary decision-making."). This Court need not nit-pick the agency adjudicator's reasoned factual analysis any further to uphold it under the deferential standard of arbitrary-and-capricious review.

       v.    <u>Denial of an Evidentiary Hearing</u>

Finally, Spin argues that the Hearing Officer arbitrarily and capriciously refused Spin's request for an evidentiary hearing about "DDOT's policy regarding exceptions and the panelists' decision to not disclose [Bolt's] preferential treatment to other applicants." ECF 3 at 23; ECF 1-6 at 2–3. Spin insists that such a hearing is required by the strictures of due process, and that "agency action that denies due process rights is arbitrary and capricious." ECF 3 at 23 (citing *Del Lab'ys, Inc. v. United States*, 86 F.R.D. 676, 681 (D.D.C. 1980)).

Of course, one major problem with Spin's argument is that the agency's process did not violate any due process right of Spin because Spin did not have a protected liberty or property

interest in the denied permits. *See supra* Section III.A. Further, to the extent Spin believes its right to an evidentiary hearing arose from some other source—or from the agency's general obligation for reasoned decision-making—the Hearing Officer denied Spin an evidentiary hearing on a reasonable and appropriate basis. As Calmeise explained, she did not need any testimony to assess the issues within her review authority, and the claims of preferential treatment were not within that authority, as discussed above. ECF 1-7 at 2; *see* ECF 1-8 at 10.

All told, Spin has not shown a likelihood of success on any of its claims. The Court must deny Spin's motion for a preliminary injunction on that basis. *Ark. Dairy Coop Ass'n, Inc.*, 573 F.3d at 832; *Brown*, 386 F. Supp. 3d at 24.

*    *    *

For the foregoing reasons, Spin's motion for preliminary injunction, ECF 3, is **DENIED**. A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: April 24, 2025